Rabin, J.
At issue is whether, by virtue of defendant’s absolute liability for “ death or wounding * * * or any other bodily injury ” as set out in article 17 of the Warsaw Convention [49 U. S. Stat. 3014, 3018], plaintiffs may recover any damages for psychic trauma suffered on board a hijacked aircraft. The preliminary question, in the context of plaintiffs’ motions for summary judgment, is whether any triable issue of fact has been presented as to the meaning of critical terms of article 17, the official text of which is in French. For reasons which follow, we conclude that the precise meaning of article 17 is not a disputed issue of fact requiring trial in this case and that summary judgment should be granted to plaintiffs on the issue of liability, to the following extent. At trial, plaintiffs should be allowed to prove damages for palpable, objective bodily injuries suffered, whether caused by psychic trauma or by the physical conditions on the aircraft, irrespéctive of impact, but not for psychic trauma alone.
On September 6, 1970, while en route from Tel Aviv, Israel, to New York City, defendant’s aircraft was hijacked by self-proclaimed members of the so-called Popular Front for the Liberation of Palestine, diverted to the Middle East and forced to land in the desert near Amman, Jordan. For the next six days, the passengers and crew members were held captive on or near the aircraft by Arab guerillas armed with rifles and hand grenades. On September 12, 1970, the passengers were directed onto buses and immediately thereafter forced to watch the aircraft destroyed by explosives. They were then taken to a hotel and the following day released and returned to New York. Plaintiff Edith Rosman and her two young children, Hannah and Leah, and plaintiff Miriam Herman, then age 17, were among the passengers.[1] They claim to have suffered severe psychic trauma during the ordeal, fearing for their lives and personal safety at the hands of the terrorists. While none of them alleges to have been shot, struck or personally assaulted *389 by any of the hijackers, the plaintiffs, all Jewish, naturally feared that their lives were in grave danger. In addition to this emotional stress, plaintiffs allege to have been damaged by the physical circumstances of their imprisonment aboard the aircraft. They claim to have been confined almost exclusively to their seats, subjected to great temperature extremes of the desert, and deprived of adequate food and water.
The Rosman and Herman actions, consolidated for the purposes of this appeal, are before us in the context of plaintiff’s motions for summary judgment on the issue of liability. Defendant Trans World Airlines, Inc. (T.W.A.) is claimed to be absolutely liable for plaintiffs’ physical and psychic injuries from the hijacking under the Warsaw Convention and subsequent Montreal Agreement. (Special Term directed summary judgment for plaintiffs in both cases and the Appellate Divisions, First and Second Departments, reversed and denied summary judgment finding that triable issues of fact were presented.)
Specifically, plaintiff Edith Rosman. claims in her affidavit that as a result of the forced immobility, she developed a backache, swollen feet and a large discoloration of her upper legs and back. Because of inadequate sanitary facilities, she claims that her children developed boils and skin irritation. Scarcity of food and water allegedly caused her and the children substantial weight loss and dehydration. In addition, Mrs. Rosman claims that ‘ ‘ [a] s a result of the hijacking, I have become highly nervous, tense, anxious and extremely depressed. I have become irritable to my husband and children. I have difficulty sleeping at night. I have been compelled, on my physician’s prescription, to take tranquilizers, among other things. My daughters have also become nervous and restless and to this day have nightmares associated with the hijacking.”
Plaintiff Miriam Herman claims in her affidavit that she “ lost much weight, slept very little, became extremely frightened and developed a skin rash. As a result of the hijacking, I have become highly nervous, tense and anxious, and I have * * * sustained other injuries. I have been and am currently under a physician’s care. I have been compelled to take, on his prescription, tranquilizers, among other things.”

*390
Background: The Warsaw Convention

There is no dispute that defendant’s liability, if any, is governed by the provisions of an international treaty commonly called the Warsaw Convention, as supplemented by a contractual arrangement known as the Montreal Agreement. The Convention, formally entitled Convention for the Unification of Certain Rules Relating to International Transportation by Air, was concluded at Warsaw, Poland, on October 12, 1929, and adhered to by the United States on June 27, 1934 by Presidential proclamation. It is drawn up in French[2] and printed in French in the United States Statutes at Large (49 U. S. Stat. 3000-3009) together with an English translation (49 U. S. Stat. 3014-3023). It is a major multilateral agreement governing the rights and responsibilities of passengers, shippers and carriers in certain aspects of international air transportation among its more than one hundred contracting Nations.
The primary objectives of the Convention are to establish uniform rules of documentation in air transportation (tickets, baggage checks and waybills) and to limit the liability of the air carriers in case of accident (Block v. Campagnie Nationale Air France, 386 F. 2d 323, 327, cert. den. 392 U. S. 905). The liability of air carriers for damage to passengers — the determination of which is the center of this controversy — is provided in article 17 in English translation as follows:[3] “ The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident[4] which caused the damage so *391 sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking. ’ ’ (49 U. S. Stat. 3018.) (Emphasis added; footnote added.)
The Convention then prescribes certain defenses available to the carrier and sets maximum liability per passenger at 125,000 Poincaré francs ($8,291.87). The United States’ dissatisfaction with this low liability limit led it on November 15, 1965 to give formal six-month notice of denunciation of the Convention. This notice, in turn, prompted a conference in Montreal, attended by delegates from 59 Nations and representatives of airline industry groups. An interim arrangement known as the Montreal Agreement (Agreement C.A.B. 18900, Civil Aeronautics Board Order Approving Agreement, May 13, 1966, 31 Federal Register 7302) emerged from this conference by which the majority of international air carriers, including the defendant, agreed to increase their liability limit per passenger to $75,000 inclusive of legal fees and to waive any defense under subdivision (1) of article 20 of the Convention.[5] By the waiver, the participating carriers agreed to accept the liability imposed upon them by article 17 of the Warsaw Convention without fault. Thus, as the parties agree, the Montreal Agreement modifies the effect of the Warsaw Convention only to the extent of providing for absolute liability up to $75,000; it does not change the substance of that liability — i.e., the character of the compensable injuries — as it is provided in article 17 of the Convention.[6]
Defendant claims that the liability scheme of Warsaw and Montreal does not allow recovery for the injuries plaintiffs allege because (1) injury resulting from psychic trauma alone, with or without palpable physical manifestation, is not “ bodily injury ” within the meaning of article 17, and (2) the physical injuries claimed did not result from any impact and in any case are so slight as not to amount to compensable “ bodily injury ”.
*392 I
The dispositions below of plaintiffs’ motions for summary judgment give rise to the preliminary question posed on these appeals — whether a material issue of fact requiring trial has been presented. In both the Eosman and Herman actions, Special Term concluded that no triable issue was presented, granted summary judgment to plaintiffs on the issue of liability for both physical injuries and psychic trauma and directed trial on the issue of damages. The Appellate Divisions, First Department (in the Eosman action) and Second Department (Herman action), reversed and denied summary judgment, finding that they could not take judicial notice of the meaning of a foreign language and that triable issues of fact were presented as to the “ precise meaning ” of the French text of article 17. We disagree.
At issue in these cases is the proper meaning to be ascribed to the liability provisions of the Warsaw Convention, a treaty of the United States. While the treaty is written in French, it is nevertheless a domestic, not a foreign law. It is the supreme law of the land (U. S. Const., art. VI, cl. 2) of which New York courts are required' to take judicial notice (CPLR 4511, subd. [a]). The ‘ ‘ precise meaning ’ ’ of the terms of the Convention, therefore, is to be determined by the court as a question of law (CPLR 4511, subd. [c]) and cannot be treated as a triable issue of fact so as to defeat consideration of a motion for summary judgment.
Defendant argues that if the meaning of the terms of the Convention is a question of law for the court, then a hearing under CPLR 4511 (subd. [d] )[7] should be held and expert testimony received as to the French legal meaning of the terms, and an attempt made to probe the. intent of the Warsaw drafters as to the scope of the terms “ lésion corporelle ” (“ bodily injury ”). We are aware that where the text of a treaty is drawn up in only one language, that language is controlling (Todok v. Union State Bank, 281 U. S. 449,454). And, of course, there may be cases where the meaning of the foreign text of *393 a treaty is in such dispute that a CPLR 4511 hearing is appropriate to enable a court to arrive at an accurate translation. But in this case there is absolutely no dispute over the proper translation of the liability provisions of the Convention, i.e., that the French phrase “ mort, de blessure, ou de toutes autres lesion corporelle ” in article 17 means “ death or wounding * * * or any other bodily injury ” in English. Although they would attach different connotations to these terms, the parties agree that “ lesion corporelle ” means “ bodily injury ”. Both sides urge one and the same translation of the Convention’s liability provisions — that contained in the United States Statutes at Large (49 U. S. Stat. 3018). Where a translation which fairly comprehends the meaning and scope of the foreign terms is agreed upon, the court’s inquiry should proceed toward determining the ordinary meaning of those terms and arriving at a reasonable interpretation which will effectuate the treaty’s purposes.
However, in arriving at an interpretation of a treaty whose sole official language is French, are we bound to apply French law? If we are, then a CPLR 4511 hearing might be appropriate in order to determine what that law is. We think this question and the underlying choice of law issue warrant some discussion. The parties in their briefs, and the First Department in its opinion, rely upon the statement of the United States Court of Appeals for the Fifth Circuit that “ [t]he binding meaning of the terms [of the Warsaw Convention] is the French legal meaning.”[8] (Block v. Compagnie Nationale Air France, 386 *394 F. 2d 323, 330, cert. den. 392 U. S. 905, supra [emphasis added]; see, also, Husserl v. Swiss Air Transp. Co., 351 F. Supp. 702, 708, affd. 485 F. 2d 1240.) In the context of the court’s opinion, we do not think this statement can be regarded as a conclusion that internal French law is to be “ applied ”, in the choice of law sense, to determine the meaning and scope of the Convention’s terms. Of course, French legal usage must be considered in arriving at an accurate English translation of the French. But when an accurate English translation is made, and agreed upon, as here, the inquiry into meaning does not then revert to a quest for past or present French law to be “ applied ”, for revelation of the proper scope of the terms. It does not follow from the fact that the treaty is written in French that in interpreting it we are forever chained to French law, either as it existed when the treaty was written or in its present state of development. There is no suggestion in the treaty that French law was intended to govern the meaning of Warsaw’s terms, nor have we found any indication to this effect in its legislative history or from our study of its application and interpretation by other courts. Indeed, analysis of the cases indicates that the courts, in interpreting and applying the Warsaw Convention, have not considered themselves bound to apply French law simply because the Convention is written in French.* *******[9]
*395 We are not persuaded that the treaty’s language controls the particular national law, if any, to be applied in determining the meaning of its terms, and thus conclude that a CPLR 4511 hearing is not required to determine French law.
Nor do we see any useful purpose to be served by such a hearing to search out the intent of the drafters of Warsaw. Our study of the minutes of the Convention indicates that the drafters did not define or discuss what was meant by the phrase “ death or wounding * * * or any other bodily injury ” in article 17[10] (see, e.g., Lowenfeld, Hijacking, Warsaw, and the Problem of Psychic Trauma, 1 Syracuse J. of Int. Law and Commerce 346, 347-348). In addition, the question of whether psychic injury is a “ bodily injury ” “ was never talked about at Montreal ” (p. 347).
We are of the opinion that informed consideration of the legal questions presented would not be aided by additional testimonial and documentary evidence on the French language, French law or the legislative history of the Convention. The only issue is the legal significance of the terms used and further inquiry into their “ precise meaning ” is unnecessary. Accordingly, we would not remand for a CPLR 4511 hearing.
n
We proceed, therefore, to consider the merits of plaintiffs’ contention that psychic trauma is fully compensable under the Warsaw Convention. In doing so, we look to the purposes of the Convention and the ordinary meaning of its terms and seek to apply the “ fundamental principle ” that a treaty should receive a liberal interpretation to give effect to its apparent purposes (Todok v. Union State Bank, 281 U. S. 449, supra; Geofroy v. Riggs, 133 U. S. 258, 271-272; Matter of Zalewski, 292 N. Y. 332, 336).
*396 The apparent purpose of the entire Convention is uniformity among its diverse adherent Nations — the achievement, so far as possible, of a uniform body of law as to the various subject matters which are covered. The particular provisions limiting liability were designed to assure that only a regulated burden be borne by the air carriers (Eck v. United Arab Airlines, 15 N Y 2d 53, 59, supra), and to afford a more definite basis for passenger recovery (see letter of Secretary of State Cordell Hull dated March 31,1934, Senate Comm, on Foreign Relations, message from the President of the United States Transmitting a Convention for the Unification of Certain Rules, Sen. Exec. Doc. No. G, 73d Cong., 2d Sess. 3-4 [1934]). These liability provisions should, we believe, be interpreted to promote uniformity both of the substance and application of the Convention.
Looking to the language of the Convention’s liability provisions, we are cognizant that, in interpretation of an international agreement, the object is “to ascertain the meaning intended by the parties for the terms in which the agreement is expressed, having regard to the context in which they occur and the circumstances under which the agreement was made.” (Restatement, 2d, Foreign Relations Law of the United States, § 146.) The language is to be taken according to its ordinary and natural meaning (Geofroy v. Riggs, supra; Hamilton v. Erie R. R. Co., 219 N. Y. 343, 353, writ of error dsmd. sub nom. Erie R. R. Co. v. Hamilton, 248 U. S. 369).
The parties agree that the translation of article 17 contained at 49 U. S. Stat. 3018 is accurate and we will refer therefore to the English terms. From study of the meaning and usage of the French terms, however, we believe that our conclusions follow as well from the “ ordinary meaning ” of the French as the English. The critical language is “ death or wounding of a passenger or any other bodily injury suffered by a passenger The inclusion of the term “ bodily ” to modify “ injury ” cannot be ignored, and in its ordinary usage, the term “ bodily ” suggests opposition to “ mental ”. This traditional dualism may or may not reflect the actual physiological structure of the human organism; it may be that fright and emotional distress are as much “ bodily ”, in the sense of “ physiological ”, as a broken leg. But the relationship between “ mind ” and “ body ”— a stubborn problem in human *397 thought — is not the question before us nor one we would presume to decide. Rather, in seeking to apply the treaty’s terms to the facts before us, we ask whether the treaty’s use of the word “ bodily ”, in its ordinary meaning, can fairly be said to include “ mental ”. We deal with the term as used in an international agreement written almost 50 years ago, a term which even today would have little significance in the treaty as an adjective modifying “ injury ” except to import a distinction from “ mental ”. In our view, therefore, the ordinary, natural meaning of “ bodily injury ” as used in article 17 connotes palpable, conspicuous physical injury,[11] and excludes mental injury with no observable “ bodily ”, as distinguished from “ behavioral ”, manifestations.
This reading of “ bodily injury ” defeats as well plaintiff’s suggested interpretation of “wounding” (“ blessure ”) as comprehending “ hurt ”, emotional or physical. Read in context, as it must be, “ wounding ” is limited by the subsequent phrase “ or any other bodily injury ” and in its ordinary meaning does not, we believe, connote more than solely physical wounds. Only by abandoning the ordinary and natural meaning of the language of article 17, could we arrive at a reading of the terms “ wounding ” or “ bodily injury ” which might comprehend purely mental suffering without physical manifestations. Such an abandonment would little serve the interests of promoting uniformity in the treaty’s interpretation and application — interests which we must observe and further.
Plaintiffs suggested on oral argument, however, that the Warsaw Convention does not impose uniformity as to the meaning of “ wounding ” or “ bodily injury ” but rather leaves the meaning and coverage of these terms to local decision. It was argued that New York law, specifically the prin- ' ciples of Battalla v. State of New York (10 N Y 2d 237) should be applied in this hijacking situation and recovery for provable damages from psychic trauma be allowed. (See Lowenfeld, Hijacking, Warsaw, and the Problem of Psychic Trauma, *398 1 Syracuse J. of Int. Law and Commerce 345.) It is true that not all matters covered by Warsaw are governed by uniform rule. Indeed, the treaty itself specifies that the law of the court to which the case is submitted is to be applied to determine a passenger’s contributory negligence (art. 21), questions of procedure (art. 28, subd. [2]) and the method of calculating the two-year limitation period for bringing an action (art. 29, subd. [2]). Determination of the degree of default considered equivalent to willful misconduct (“ dol ”) is left by article 25 (subd. [1]) to the law of the forum. We are also aware that it has generally been held in the United States that Warsaw does not create an independent right of action for personal injuries or death but depends upon the existence of some other basic law at the place of the accident or elsewhere to grant the right of action. (See, e.g., Komlos v. Compagnie Nationale Air France, 111 F. Supp. 393, revd. on other grounds 209 F. 2d 436, 438; Noel v. Linea Aeropostal Venezolana, 247 F. 2d 677, 679, cert. den. 355 U. S. 907; Wyman v. Pan Amer. Airways, 181 Misc. 963, affd. 267 App. Div. 947, affd. 293 N. Y. 878; but see Salamon v. Koninklijke Luchtvaart Maatschappij, N. V. 107 N. Y. S. 2d 768, 773, affd. 281 App. Div. 965; Calkins, The Cause of Action Under the Warsaw Convention, 26 J. of Air Law and Commerce, 217-236, 323-342.)
Yet, even if plaintiffs’ actions for damages depended upon some other subsisting right of action for personal injuries in New York, it does not follow that New York or any other jurisdiction can redefine the scope or substance of the carrier’s liability as it is provided in the Convention. The construction of the terms “ wounding ” and “ bodily injury ” which plaintiffs suggest, not only strains their ordinary meaning in context but would alter the nature of the carrier’s liability under the Convention. The application of local law would impress an artificial sense upon the terms which finds no warrant in the treaty and such a course would surely be a deviation from the principles of treaty construction (Santovincenzo v. Egan, 284 U. S. 30, 40; Geofroy v. Riggs, 133 U. S. 258, 271, supra). Particularly are the vagaries of local law application and attendant conflicts of law problems to be avoided in the case of this Convention which aims at uniformity of application among its national parties. That the Convention may fall *399 short of this aim does not reduce' our obligation under the Constitution to observe its terms and attempt to effectuate its purpose rather than impose upon it our own particular State policies. (Cf. Kolovrat v. Oregon, 366 U. S. 187, 198.) “ Public policy which frowns on contractual limitations of liability of a common carrier * * * is subordinate to the provisions of the Convention insofar as they are operative.” (Garcia v. Pan Amer. Airways, 269 App. Div. 287, affd. 295 N. Y. 852, cert. den. 329 U. S. 741; see, also, United States v. Pink, 315 U. S. 203, 231-233.)
A faithful reading of the terms of the Convention leads, we believe, to the following conclusions. A claim for damages under article 17 arises “ in the event of * * * bodily injury ”. The claim must therefore be predicated upon some objective identifiable injury to the body. In addition, there must be some causal connection between the bodily injury and the “ accident ”. In our view, this connection can be established whether the bodily injury was caused by physical impact, by the physical circumstances of the confinement or by psychic trauma. If the accident — the hijacking — caused severe fright, which in turn manifested itself in some objective “ bodily injury ”, then we would conclude that the Convention’s requirement of the causal connection is satisfied. For example, if plaintiff Herman’s skin rash was caused or aggravated by the fright she experienced on board the aircraft, then she should be compensated for the rash and for the damages flowing from the rash. It follows that, if proved at trial, she should be compensated for her mental anguish, suffered as a result of the rash, since this anguish would have flowed from the “ bodily injury ”.
Thus, as we read article 17, the compensable injuries must be “ bodily ” but there may be an intermediate causal link which is ‘ ‘ mental ’ ’ between the cause — the ‘ ‘ accident ’ ’— and thq effect — the “ bodily injury ”. And once that predicate of liability — the [1] ‘ bodily injury ’ ’— is established, then the damages sustained as a result of the “ bodily injury ” are compensable, including mental suffering.[12] At least to this *400 extent, the treaty may be afforded a liberal interpretation which tends to support the rights which plaintiffs claim under it. (Asakura v. Seattle, 265 U. S. 332, 342.) However, only the damages flowing from' the “ bodily injury ”, whatever the causal link, are compensable. We are drawn to these conclusions by the clear import of the terms of article 17. Those terms, in their ordinary meaning, will not support plaintiffs’ claim that psychic trauma alone, or even the psychic trauma which caused the bodily injury, is compensable under the Warsaw Convention. (Cf. Husserl v. Swiss Air Transp. Co., 351 F. Supp. 702, 708 [dicta], affd. 485 F. 2d 1240, supra; Burnett v. Trans World Airlines, 368, F. Supp. 1152, supra.)
We hold, therefore, that defendant is liable for plaintiff’s palpable, objective bodily injuries, including those caused by the psychic trauma of the hijacking, and for the damages flowing from those bodily injuries, but not for the trauma as such or for the nonbodily or behavioral manifestations of that trauma.
Accordingly, in each case, the order of the Appellate Division should be reversed, the order of Special Term granting summary judgment to plaintiffs on the issue of liability reinstated and the case remitted for trial on the issue of damages in accordance with this opinion.

. Plaintiffs Eliezer Rosman and Alexander Herman were not passengers and sue herein in representative and derivative capacities for medical expenses and loss of services.

. Article 36 of the Convention provides: “ This convention is drawn up in French in a single copy which shall remain deposited in the archives of the Ministry of Foreign Affairs of Poland and of which one duly certified copy shall be sent by the Polish Government to the Government of each of the High Contracting Parties.” (49 U. S. Stat. 3022.)

. The original text of article 17 reads: “ Le transpórteme est responsable du dommage survenu en cas de mort, de blessure, ou de toute autre lésion eorporelle subie par un voyageur lorsque 1’accident qui a causé le dommage s’est produit á bord de l’aérnoef ou au cours de toutes operations d’embarquement et de débarquement.” (49 U. S. Stat. 3005; emphasis added.)

. Defendant has made no claim on these appeals that a hi j acting is not an “accident” within article 17. (See Husserl v. Swiss Air Transp. Co., 351 F. Supp. 702, 707, affd. 485 F. 2d 1240.)

. Article 20 (subd. [1]) provides: “ The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.” (49 U. S. Stat. 3019.)

. A full treatment of the Warsaw Convention and its aftermath through the Montreal Agreement is provided by Lowenfeld and Mendelsohn, The United States and the Warsaw Convention (80 Harv. L. Rev. 497).

. CPLR 4511 (subd. [d]) provides, among other things, that “in determining the matter of law to be judicially noticed, the court may consider any testimony, document, information or argument on the subject, whether offered by a party or discovered through its own research.”

. In the court’s opinion, this statement occurs in the following context: “ The Statutes at large for 1934 indicate that it was the French text to which the United States adhered in the instrument the United States deposited in the archives of the Ministry of Poland, 49 Stat. 3013 (1934).8 **********19 [Footnote 19 states: “However, on June 15, 1934, the text that was read to the Senate, and to which the resolution of ratification was directed, was a text in English originally published in a Treaty Information Bulletin of the Department of State in March, 1934, 78 Cong. Rec. #115 77-82 (1934).”] The binding meaning of the terms is the French legal meaning. ‘ The principle of the primacy of the French legal system thus means a harmonizing construction of the Convention.’ This principle should not be carried to extremes, but ‘ [u]niformity may be maintained without many futile disputes as to whether, why and when resort to the teachings in Paries [i.e., the minutes of the proceedings leading to the final text of the Convention] should be made.’ ” [The quotation is from *394 Sundberg, Air Charter: A Study in Legal Development, pp. 242-249 (Stockholm, 1961).] (386 F. 2d 323, 330.) The issue in Bloch was whether international “ voyage ” charter flights are covered by the Warsaw Convention. The court’s task was to determine Warsaw’s concept of a contract of carriage, and it necessarily took into account the importance to the drafters, the majority of whom were from civil law countries, of the civil law notion of contract. In finding these charters covered by Warsaw, the court did not, however, “ apply ” internal French law, but rather expressly based its holding upon the facts of the ease and the text and legislative history of Warsaw (386 F. 2d, at p. 353).

. See, e.g., (1) Hjalsted, The Air Carrier’s Liability in Cases of Unknown Cause of Damage in International Air Law, 27 J. of Air Law and Commerce 1-28, 119-149 (meaning of “ all necessary measures ” in art. 20, subd. [1] [see n. 5, supra, p. 5], citing cases mainly from Europe and the United States); (2) Ross v. Pan Amer. Airways, 299 N. Y. 88, cert. den. 349 U. S. 947; Mertens v. Flying Tiger Line, 341 F. 2d 851, cert. den. 382 U. S. 816; Warren v. Flying Tiger Line, 352 F. 2d 494 (meaning of “ deliver ” in art. 3); (3) Mertens v. Flying Tiger Line, supra; Pardonnet v. Flying Tiger Line, 233 F. Supp. 683; (meaning of “domicile” of carrier in art. 28, subd. [1]); (4) Eck v. United Arab Airlines, 360 F. 2d 804; Nudo v. Societe Anonyme Belge D’Explor *395 tation, 207 F. Supp. 191; Spencer v. Northwest Orient Airlines, 201 F. Supp. 504; Winsor v. United Air Lines, 153 F. Supp. 244 (meaning of “principal place of business ” in art. 28, subd. [1]); (5) Eck v. United Arab Airlines, 15 N Y 2d 53; Berner v. United Airlines, 3 A D 2d 9, affd. 3 N Y 2d 1003 (meaning of “ place of business through which the contract has been made ” in art. 28, subd. [1]).

. The minutes of the Convention indicate that the debate over this article centered around the issue of when the air carrier’s liability for damage to passengers should begin and end rather than the scope of compensable injuries.

. “ In its broadest legal meaning bodily (eorporelle) injury is an injury which can be seen, which one can touch”. Henry P. de Vries’ translation: H. and L. Mazeaud and A. Tune, Traité Théorique et Pratique de la Responsabilité Civile Délictuelle et Contractuelle, 377 (5th ed., 1957).

. While the Convention governs the nature of the injuries for which the carrier is liable, it does not cover the allowable elements of damages flowing from those injuries. “It seems clear that the Warsaw Convention left this *400 issue, as it did other issues, such as who are the proper beneficiaries of a damage award, to the internal law of the parties to the convention ” (Mertens v. Flying Tiger Line, 341 F. 2d 851, 858, cert. den. 382 U. S. 816 [the court suggested that on remand, New York conflict of law rules would apply in a Federal diversity action- in New York’s Southern District in determining whether parents of an air crash victim would recover for their mental pain and anguish]). (See, also, Burnett v. Trans World Airlines, 368 F. Supp. 1152.) (Mental anguish and emotional distress directly resulting from physical injuries suffered in hijacking were compensable in an action under article 17; see, generally, Calkins, The Cause of Action Under the Warsaw Convention, Part II, 26 J. of Air Law and Commerce 323, 339-340.)