Nat H. Hentel, J.
On June 26, 1970, plaintiff was returning from Spain on her first trans-Atlantic roundtrip along with approximately 200 fellow passengers on board defendant’s Boeing 747 jet airliner. About 6:30 p.m., while over the Atlantic Ocean approaching John F. Kennedy International Airport, number 3 engine caught on fire and alarm bells started to sound, and passengers, following instructions, sat down and fastened their seat belts. Some 10 or 15 minutes later, alarm bells started to ring again and did not stop. As the plane neared land, plaintiff looked out the cabin’s windows, and saw fire trucks gathered below on the landing field. As the plane prepared to land, she observed fire trucks racing alongside the plane which then landed abruptly and jolted to a stop. Plaintiff heard someone say, "This is an emergency, keep calm!” There were no other instructions issued by the captain or crew. Passengers, however, bolted from their seats and sought means of egress. A stewardess shouted, "Let’s get the hell out of here!” And then, according to plaintiff, confusion, noise, panic, and pandemonium reigned.
A crowd of passengers followed a uniformed figure to the right rear of the plane, where a door fell out of the craft; then there was movement to the left rear tail door where a mass of passengers became jammed up. She heard a stewardess scream, "This door is not working!” Then, a clot of trapped passengers moved to another door in the passenger cabin and plaintiff heard hysterical screams, cries, and shrieks, and she recalls that she was also doing these things. Thereafter, she heard someone shout, "The chutes are perforated * * * we can’t get out!” At that time, there was one other exit with about 100 people frantically trying to get out in midcabin. It was impossible to obtain egress, no one was moving.
At that point, plaintiff lost her balance and fell to the cabin floor. She could not get up and she became unconscious. She *155 then felt hands pulling her upright, and she heard "O.K., the fire’s out”. Efforts were then first made to calm the passengers. Plaintiff believes she was on the cabin floor for "at least five minutes” during which time other passengers came into contact with her, stepped on and jostled her, and she suffered blows to her legs and body while passengers were "stumbling all over me.” Her clothes became torn and dirtied, her hair and make-up were in disarray, and she was "shivering, trembling and crying out of control.”
Finally, after what must have seemed an eternity, she was helped from the plane and driven to the TWA passenger terminal where she felt "hysterical, shock, pain all over, and paralyzed.” She knew that she had been practically trampled all over including her neck, back, head, arms, legs, and stomach. Defendant did not introduce any witnesses or documentation, subsequent to plaintiffs case, to counter this stark recital of terror, but was merely content to cross-examine plaintiff and plaintiffs medical witness during plaintiffs case, after which defendant rested.
Liability is not in issue in this proceeding. Defendant admits that it is liable to plaintiff if she suffered "bodily injury” while a passenger on one of its aircraft under the provisions of the so-called "Warsaw Convention” as later modified by the "Montreal Agreement” (infra) which raised the limit of liability per passenger injured on an aircraft engaged in international flight to $75,000. This being a CPLR 325 (subd [d]) transfer from Queens Supreme Court for trial in this court, plaintiff’s recovery would then be limited to a sum of up to $50,000, for her one and only cause of action for personal injuries since that sum is demanded in her complaint.
What then are the "bodily injuries” she claims she sustained as a result of this frightening and trying experience, and what are her damages? She first visited with her family physician, Dr. Harrison, on June 30, 1970. At that time, she stated she was "very weak, sick and pained badly all over.” Dr. Harrison testified that his impressions on June 30, 1970, following a thorough physical examination of plaintiff, were of "concussion, headaches, dizziness, anorexia, acute trauma, anxiety tension, palpitation, shakiness, recurrent and aggravated colitis, abdominal pain and cramps, lumbar sprain and strain, restrictions in walking and movement in all directions, and cervical strain aggravated by motion.” He diagnosed her injuries as otitis media (eardrums) causing deafness (for which *156 he sent her to an ear specialist); right arm contusions; left arm strain; strains of the right hand and wrist, left ankle and foot; and contusion and ecchymosis with a 2-inch by 2-inch hematoma in the iliac crest area of the right side abdominal wall. His recommended course of treatment included mandatory rest; abstinence from her normal work as a Criminal Court reporter for the City of New York; and he prescribed analgesics, tranquilizers and sleeping pills. Thereafter, Dr. Harrison saw plaintiff on July 2, 3, 7 and on July 13, 1970, when he found plaintiff improved with respect to her neck and back pains. He approved of her going back to a light work schedule at that time. He saw her again on July 28, 1970, and again more than a year later on November 11, 1971, when she continued to complain of "some pain in her right arm from the wrist to shoulder on and off.” He then examined her on October 7, 1976, almost five years after the last visit when she complained to him that she had "poor sleep since June 26, 1970.” She also presently complains of residual disturbance of her sleep and of occasional intestinal cramps and pains.
Plaintiff testified, without objection, that following the accident she had trouble sleeping because she had recurrent nightmares about dying. She never had nightmares before the accident. She would be awakened by these dreams at least once a week for the first year after the accident. She recalls the nightmares always involved an airplane on fire, frantic attempts to escape from the plane because it might explode, fruitless attempts to get out of the plane, and of being blownup. After these sessions she would have difficulty getting back to sleep and prescription sleeping pills would be of some help. These dreams have now subsided but, occasionally, she still has nightmares; at times she cannot sleep; she still gets back pains and nervous stomach pains, her right arm continues to hurt, and she gets headaches.
Plaintiff also testified that she was not able to perform her official duties for almost three weeks following the accident and that her equivalent loss of earnings was $810 since her absence was charged against her accrued sick leave. She visited a Dr. Lewinson, an ear specialist; a Dr. Schneiderman, an orthopedic surgeon in 1972, when her back was "hurting very badly” and a gastro-enterologist in February, 1976, in addition to her sessions with Dr. Harrison.
Dr. Harrison’s uncontroverted expert testimony was that, in his opinion, and with a fair degree of medical certainty, the *157 accident was the competent producing cause of (1) plaintiffs injuries and pain; (2) her inability to work for nearly three weeks; (3) her recurrent, aggravated colitis condition — an emotional stress-induced physical condition; (4) her "permanent aggravation of the pre-existing colitis”; and (5) her poor sleep, nightmares, and mental disturbance symptomatology. Plaintiff was 42 years of age at the time of the accident. The only proof of plaintiffs medical expenses was Dr. Harrison’s testimony that the reasonable value of his medical services all told was in the sum of $99.
In limitation of defendant’s absolute liability for damages, defendant relies on the argument that plaintiffs "bodily injuries” under the "Warsaw Convention” (infra) were not serious ones in that most of them cleared up within short periods of time, and, thus, she would only be entitled to nominal damages; and that her psychic or emotional trauma allegedly caused by this airplane accident are not compensable under the "Convention” since they are emotional or mental in nature as opposed to the strictly physical or "bodily” injuries contemplated within the purview of the "Convention.” The court finds that plaintiff sustained the specified physical injuries as a result of the detailed occurrence, which heightened passenger panic and frustrated attempts to escape from what apparently was an emergency situation threatening life and limb of all passengers.
The 1929 "Warsaw Convention,” to which the United States became a signatory, is an international treaty applicable to this flight. Article 17 of the treaty (US Code, tit 49, § 1502) provides: "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.” (Emphasis supplied.)
See Day v Trans World Airlines (393 F Supp 217), which enunciate the purposes of the convention. It essentially creates a presumption of liability on the part of the air carrier for injury without proof of fault. The "Warsaw Convention” is the supreme law of the land of which New York courts must take judicial notice. (US Code, tit 49, § 1502; CPLR 4511; US Const, art VI, cl 2; Rosman v Trans World Airlines, 34 NY2d 385.)
In 1966, the United States ratified the so-called "Montreal *158 Agreement,” (CAB Agreement 18900; 31 Fed Reg 7302), which raised the maximum recovery to $75,000 per individual, and which also imposed absolute liability upon the air carrier upon proof that the passenger sustained "bodily injury” in an "airline” accident. (Rosman v Trans World Airlines, supra.) The question then is shall plaintiff also recover for her emotional injuries and mental anxieties manifested by nightmares, and loss of sleep she has experienced. Defendant claims that the phrase " bodily injury’ connotes palpable, conspicuous physical injury and excludes mental injury with observable bodily’ as, distinguished from 'behavioral’ manifestations.” Defendant cites Rosman v Trans World Airlines (supra) as authority for its contention that "neither psychic trauma alone, nor the psychic trauma in and of itself which caused a bodily injury are compensable under the 'Warsaw Convention’.”
The accident which befell plaintiff cannot be compared to those where injuries result from automobile collisions or other commonplace, tortious conduct in assessing her damages. Such other accidents involve the happening of injuries in split seconds of time where no more than momentary apprehension or anticipation (mental suffering) of serious bodily injury or possible death occur. Here, the court must take judicial notice, as the sole trier of the facts, that any person in plaintiff’s predicament would anticipate and be terrified, on a sustained basis, by the possibility of suffering very serious injury or death while a captive in a burning aircraft. Such anticipation, anxiety and anguish would not be suffered in split seconds, but over a prolonged period of 20 minutes or more which heightened plaintiff’s natural horror and the consequential psychic traumatic effects of the situation. Each second was an eternity. This was not a Hollywood simulated catastrophe, but rather a real life terror-in-the-sky emergency which, undoubtedly, had an overwhelming, engulfing, terror-stricken impact on plaintiff as a captive passenger. Plaintiff not only suffered insult and injury, but also an extraordinarily prolonged assault upon her senses with dramatic short and long range effects. The obvious mental anguish which all passengers including plaintiff must have suffered over their possibility of being destroyed in a crash or by an explosion in midair beggars normal imagination unless one has actually been the victim of such events. This court concludes that the assault against the plaintiff’s emotional senses of these circumstances *159 was so pervasive as to be tantamount to the infliction of physical blows upon her body, and was the same as if she had suffered additional, actual bodily injuries. The ordinary measure of damages should not apply to this accident and the resulting injuries to plaintiff, since this is not the ordinary accident to which people are usually exposed.
Plaintiff has a right to recover for the emotional injuries this court finds she has sustained and proved, and this is so even where there is no accompanying "bodily injury”. (Battalia v State of New York, 26 AD2d 203, 205, affd 24 NY2d 980.) In this case, the court held: "fright can have serious mental and physical consequences” (emphasis supplied) which are compensable. The court in the Battalia case commented that (pp 207-208) "assessment of monetary damages for injuries suffered from fright is subject to the ordinary rule that the amount awarded must be fair and reasonable and sufficient to compensate for the said injuries.”
Here, however, the court finds that plaintiff suffered bodily injuries of such a nature and under such singular circumstances as would produce mental and emotional anxiety sufficient to trigger an aggravation of her pre-existing colitis condition, and which would also create sleep-disturbing nightmares over a prolonged period of time. Under the doctrine of the Rosman case (34 NY2d 385, supra) recovery for such mental and emotional anguish is allowable. The emotional trauma which plaintiff was required to suffer as a result of her "bodily injuries” were of such palpable, objective, and identifiable nature, manifested by "shivering, shaking, trembling, and crying out of control”, as to be considered additional bodily, physical injuries and thus compensable as such.
The court in the Rosman case (supra, pp 399-400) made the following comments which appear to have been written for application to this case. "The claim must therefore be predicated upon some objective identifiable injury to the body. In addition, there must be some causal connection between the bodily injury and the 'accident’. In our view, this connection can be established by the physical circumstances * * * or by psychic trauma [Emphasis added.]. If the accident * * * caused severe fright, which in turn manifested itself in some objective 'bodily injury’, then we would conclude that the [Warsaw] Convention’s requirement of the causal connection is satisfied. * * * It follows that, if proved at trial, she should be compensated for her mental anguish, suffered as a result of *160 the rash, since this anguish would have flowed from the 'bodily injury’. * * * once that predicate of liability — the 'bodily injury’ — is established, then the damages sustained as a result of the 'bodily injury’ are compensable, including mental suffering. At least to this extent, the treaty may be afforded a liberal interpretation which tends to support the rights which plaintiffs claim under it. * * * However, only the damages flowing from the 'bodily injury’, whatever the causal link, are compensable.” (Emphasis supplied.)
Under all the circumstances, the court finds judgment for the plaintiff in the sum of $10,000.