George KARFUNKEL and Renee
Karfunkel, Plaintiffs,

v.

COMPAGNIE NATIONALE AIR
FRANCE and Singapore Air-
lines, Ltd., Defendants.

No. 76 Civ. 3138.

United States District Court,
S. D. New York.

March 4, 1977.

Speiser & Krause, P. C., New York City, for plaintiffs; Charles F. Krause, Stuart M. Speiser, Frank H. Granito, Jr., New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant Compagnie Nationale Air France; William J. Junkerman, Randal R. Craft, Jr., William F. Martin, Jr., New York City, of counsel.

WYATT, District Judge.

There are two motions before the Court. The first in point of time was made by plaintiffs to strike the Third, Fourth and Fifth affirmative defenses in the amended answer of Compagnie Nationale Air France (Air France). Fed.R.Civ.P. 12(f). The three affirmative defenses questioned by the motion assert defenses based on the Warsaw Convention or ·on the Montreal Agreement (later mentioned in connection with these defenses).

The second motion was made by Air France to dismiss the claims against it for lack of jurisdiction over the subject matter. Such a motion is authorized by Fed.R.Civ.P. 12(b)(1) but Air France (mistakenly, it is believed) cites Fed.R.Civ.P. 12(d) and 12(h)(3).

Plaintiffs are husband and wife who were passengers on June 27, 1976, aboard the Air France plane from Tel Aviv to Paris, stopping at Athens, which was seized after leaving Athens in a sensational hijacking by terrorists, diverted to Entebbe Airport in Uganda, and later rescued in a daring and successful military operation by Israeli forces.

The action was commenced on July 15, 1976. An amended complaint was filed on July 31, 1976.

The amended complaint pleads four claims, two against Air France and two against the other defendant, Singapore Airlines, Ltd. (Singapore is sought to be held liable for having brought the terrorists to Athens Airport.) Singapore is in no way concerned with the present motions.

In their two claims against Air France, George and Renee, the plaintiffs, seek damages for bodily injuries and false imprisonment suffered by them at the hands of the hijackers. It is averred that Air France was negligent in failing to take adequate security precautions which would have prevented the hijackers from boarding the airplane with weapons.

The jurisdiction of this Court· is invoked on the ground of diversity of citizenship: that plaintiffs are citizens of New York and that defendants are not New York corporations and do not have their principal places of business in New York. 28 U.S.C. § 1332(a) and (c).

The two pending motions raise a basic issue: does the Warsaw Convention apply to the flight on which plaintiffs were travelling when they suffered the damages claimed? If so, the action cannot be maintained here against Air France.

1.

On June 6, 1976, George and Renee bought from a Manhattan travel agency two tickets for a June 8 flight on TWA from New York to Milan, Italy. On the same day, they also bought two return tickets on TWA for a June 30 flight from Paris to New York. On June 7, 1976, they purchased from the same travel agent two tickets for a June 18 Swissair flight from Milan (through Zurich) to Tel Aviv, Israel.

On June 23, 1976, while in Israel, George purchased for him and Renee two tickets

for an Air France flight from Tel Aviv to Paris for June 27. These tickets were sold to the Karfunkels by a Jerusalem travel agent at a special reduced fare known as the "student and youth" tariff. This fare, according to International Air Transport regulations, is available for transportation between the Middle East and Europe.

On June 27, the Karfunkels departed Tel Aviv for Paris aboard the Air France flight. During a scheduled stopover at Athens airport, the airplane on which the Karfunkels were travelling was boarded by four terrorists armed with guns and explosives.

Shortly after take-off from Athens, the terrorists seized control of the aircraft and directed that it be flown to Benghazi, Libya. One passenger was released at Benghazi. The plane was then flown at the hijackers' direction to Entebbe Airport in Uganda. At Entebbe, crew and passengers (including plaintiffs) were held hostage in the airport terminal building while the hijackers made several demands upon the governments of various countries. On July 4, Israeli military troops staged a raid on Entebbe Airport, rescuing the hostages (including plaintiffs) and transporting them to Israel aboard military aircraft.

2.

■ The Warsaw Convention, as a treaty of the United States (49 Stat. 3000; Treaty Series No. 876), is the supreme law of the land, and where applicable, the provisions of the treaty are self-executing and act as limitation on diversity jurisdiction. *Smith v. Canadian Pacific Airways, Ltd.*, 452 F.2d 798, 801 (2d Cir. 1971).

Under the Convention, a carrier is liable for "bodily injury suffered by a passenger" in an "accident" (Article 17) but "any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention" (Article 24).

One of the important "conditions" of an "action for damages" is the *place* where it must be brought. Article 28 provides that such an action must be brought either before the court of the domicile of the carrier (this would be France in the case at bar), or of the principal place of business of the carrier (this would also be France), or where the carrier has a place of business through which the contract has been made (this would be Israel), or "before the court at the place of destination".

The only possible basis for jurisdiction here in New York is that New York was "the place of destination". Not even plaintiffs seriously contend for this, nor could they.

The destination of the Air France flight on which plaintiffs were riding was Paris, not New York.

There is a provision in the Convention which under some circumstances, treats as "one undivided transportation" a series of transportations performed "by several successive air carriers". This provision is in Article 1(3) which in relevant part reads:

"Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or of a series of contracts, . . . .".

■ If *both* Air France and the plaintiffs regarded the flight from Tel Aviv to Paris as a connecting flight in "one undivided transportation" to New York, then New York might be the "place of destination" of the Karfunkels for purposes of Article 28. The evidence shows, however, that Air France did not so regard the transportation it contracted to provide the Karfunkels.

The plaintiffs' tickets from Paris to New York were bought in New York, not from Air France, but from TWA, on June 6. The tickets from Tel Aviv to Paris were not purchased until June 23 in Jerusalem and while purchased from Air France were independent of the earlier purchases and apparently without reference to New York. By purchasing tickets for the flight to France after they had reached Israel, the Karfunkels were able to take advantage of a special reduced "student and youth" fare

available for flights between Israel and France. The special fare, however, may be offered *only* in combination with "domestic fares" in France or "intra-European IATA fares" (Ex. A1, to Melisse affidavit). Tariff regulations would have prohibited sale of tickets at "student and youth" fare to the Karfunkels as part of "undivided transportation" to New York. Moreover, the affidavit of Shlomo Barzilai, the Jerusalem travel agent who sold the tickets in question, indicates that he was unaware of any intention of plaintiffs to continue on to New York from Paris.

The undisputed evidence shows that Air France regarded the destination of the Karfunkels to be Paris, not New York.

There is thus no evidence whatever that the "destination" of the trip in issue was New York. The "destination" was Paris.

### 3.

If the Warsaw Convention applies, it is entirely clear that the case at bar may not be maintained in this Court.

### 4.

█ Mention must here be made of the "Montreal Agreement".

Beginning about or before 1960, there was criticism of the limitations of liability of air carriers contained in the Warsaw Convention.

Responding to such criticism the major airlines of the world signed the "Montreal Agreement" on May 13, 1966. Under this agreement, the airlines filed a special contract with the Civil Aeronautics Board raising to $75,000 the limit of liability "on all flights to, from, or stopping over in the United States", waiving the defense of due care, and imposing absolute liability except where the passenger was at fault. See *Day v. TWA*, 528 F.2d 31 (2d Cir. 1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (Oct. 12, 1976).

The Montreal Agreement cannot apply to the case at bar because the Israel-Paris flight had no connection with the United States.

### 5.

The Warsaw Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire" (Article 1(1)). International transportation is "any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation . . . are situated . . . within the territories of two High Contracting Parties . . . " (Article 1(2)).

The Karfunkels contracted for transportation between Israel and France, both of which are High Contracting Parties to the Convention.

Article 17 of the Convention imposes liability on the carrier for "bodily injury" to a passenger if the "accident which caused the damage" took place on the aircraft, etc.

█ It must first be determined if the hijacking from which the injuries to plaintiff arose is an "accident" within the meaning of Article 17. Plaintiffs contend that the meaning of the word "accident" does not include a planned and deliberate hijacking.

This contention has already been rejected by our Court of Appeals. *Husserl v. Swiss Air, etc.*, 485 F.2d 1240 (2d Cir. 1973) affirming on the opinion of Judge Tyler in 351 F.Supp. 702 (S.D.N.Y.1972). Judge Tyler dealt with a hijacking in all respects indistinguishable from that at bar. He ruled specifically that "a hijacking is within the ambit of the term 'accident'" (351 F.Supp. at 707). This ruling was not only affirmed by the Court of Appeals but reaffirmed a few years later. *Day v. TWA*, above cited.

For plaintiffs, it is correctly pointed out that in both *Husserl* and *Day*, the Montreal Agreement was applicable whereas in the case at bar the Montreal Agreement is not applicable. This does not, however, lead to any different result. The opinion of Chief Judge Kaufman in *Day* leaves no doubt that Article 17 is to be broadly applied. His

**976**

opinion looked to the Montreal Agreement to ascertain the proper construction to be given the Warsaw Convention (528 F.2d at 36):

> "In divining the purposes of the Warsaw Treaty, we find the adoption in 1966 of the Montreal Agreement particularly instructive. This agreement did not alter the language of Article 17 of the Warsaw Convention. But it provides decisive evidence of the goals and expectations currently shared by the parties to the Warsaw Convention."

Though it considered the Montreal Agreement for purposes of treaty construction, the Court took care to note that a terrorist attack in the terminal building fell within the scope of the Warsaw Convention *as originally drafted.* In reaching this conclusion, the Court said (528 F.2d at 37–38; citations omitted):

> "Since 1929, the risks of aviation have changed dramatically in ways unforeseeable by the Warsaw framers. Air travel hazards, once limited to aerial disasters, have unhappily come to include the sort of terrorism exemplified by the Athens attack. As that incident graphically demonstrates, these new perils often spill over into the airline terminal.

> "The Warsaw drafters wished to create a system of rules that would cover all the hazards of air travel. The rigid location-based rule suggested by the appellant would ill serve that goal. Under TWA's test, many claims relating to liability for the hazards of flying would be excluded from the Warsaw system and would be governed by local law. Rather than serving the drafters' intent of creating an inclusive system, appellant's proposal would frustrate it.

> "We believe, moreover, that the result we have reached furthers the intent of the Warsaw drafters in a broader sense. The Warsaw delegates knew that, in the years to come, civil aviation would change in ways that they could not foresee. They wished to design a system of air law that would be both durable and flexible enough to keep pace with these changes.

> Our holding today confirms the framers' belief that the ever-changing needs of the system of civil aviation can be served within the framework they created."

This reasoning of the Court of Appeals is equally applicable to the case at bar. It must be concluded that the hijacking of the Air France airplane on which plaintiffs were passengers was an accident within the meaning of Article 17 of the Warsaw Convention.

### 6.

The plaintiffs also assert that, even if their first claim (for bodily injury) comes within Article 17, their second claim is based on false imprisonment and is not the type of claim which must be brought in accordance with the Warsaw Convention. The argument is that the relief available in an action for false imprisonment is not comprehended in the phrase "wounding . . . or any other bodily injury" used in Article 17 of the Convention.

██ It is true that in an action for false imprisonment, actual damages need not be shown. The confinement itself establishes a claim for at least nominal damages. Prosser on Torts, 4th Ed. p. 43. This would be the case, therefore, whether or not there had been a "bodily injury".

Recoverable damages also include compensation for interruption of business, harm to reputation, or credit, loss of the company of family, and expenses of securing release from confinement, in addition to damages for physical injuries and mental suffering. Prosser, above cited, pp. 43–44. The plaintiffs argue that some of these injuries are not a "bodily injury" and that their claim for false imprisonment may thus be brought as an alternative to, and without regard to, any claim under the Warsaw Convention.

What plaintiffs argue is that mental anguish is not included in the "death or wounding . . . or any other bodily injury" language of Article 17 of the Convention and thus is not the basis for any claim based on the Convention, but is independent of the Convention.

■ The obvious flaw in this argument is that the Warsaw Convention does not *create* claims for relief but merely establishes rules for the enforcement of claims created by applicable local law.

The further history of the *Husserl* litigation is instructive in this regard.

■ After the law of the case had been established by affirmance of the Court of Appeals of the ruling that hijacking was an "accident" under Article 17 of the Warsaw Convention, the defendant air carrier raised other arguments before Judge Tyler. One of these was that mental or psychosomatic injury was not included within the language of Article 17. Judge Tyler rejected this argument (388 F.Supp. 1238, 1248–1251) and I elect to follow his reasoning and decision.

There are other decisions reaching a different result. *Rosman v. Trans World Airlines, Inc.*, 34 N.Y.2d 385, 358 N.Y.S.2d 97, 314 N.E.2d 848 (1974); *Burnett v. Trans World Airlines*, 368 F.Supp. 1152 (D.N.M. 1973).

But a District Judge in California has followed Judge Tyler's decision. *Krystal v. BOAC*, 403 F.Supp. 1322 (C.D.Cal.1975).

■ The goal of the Warsaw Convention was to create uniformity in actions for damages arising from international air accidents. Though there is an indicated difference of opinion on the question, it seems the better view that all claims for damages for personal injuries suffered by a passenger in an "accident", whether physical or mental, be resolved in one action under the Convention.

■ It should be pointed out that under New York law no claim for false imprisonment has been stated. An essential element of such a claim is that defendant intended to confine plaintiff. *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y. S.2d 87, 93, 335 N.E.2d 310 (1975), cert. denied under the name of *Schanbarger v. Kellogg*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). No such element is here pleaded and could not be pleaded. Air France certainly never intended to confine these plaintiffs.

### 7.

It is argued for plaintiffs that, even though the "accident" and the resulting injuries be of the type controlled by the provisions of the Convention, this action is exempt from the Convention by reason of Article 34, which provides in relevant part:

> "This convention shall not apply . . . to transportation performed in extraordinary circumstances outside the normal scope of an air carrier's business."

■ There is no denying that the Air France flight on which plaintiffs were passengers would have been "international transportation" to which the Convention applied, had it proceeded without incident from Tel Aviv to Paris. The airplane was diverted to Benghazi, Libya, however, and forced to land there before proceeding to Entebbe Airport in Uganda. The plaintiffs argue that the flight from Benghazi to Entebbe, under the direction and control of terrorists, was "transportation performed in extraordinary circumstances outside the normal scope of an air carrier's business."

This argument from Article 34 cannot be accepted. Whether a particular flight is "international transportation" to which the Convention applies is determined solely by reference to the "contract made by the parties" (Article 1(2)). If, according to the contract, the place of departure and place of destination are within the territories of two High Contracting Parties, the Convention applies.

Whether a flight actually reaches its planned destination is thus irrelevant. In choosing the *contract* as the basis for determining the application of the Convention, the drafters insured that events beyond the control of the parties (crashes on take-off, at sea, or in non-signatory countries) would not deprive the carrier or the passengers of uniform treatment under the Convention.

George and Renee, the plaintiffs, contracted to be transported between Israel and France, two High Contracting Parties. The flight began under normal circum-

stances. It was not transformed to "transportation performed . . . outside the scope of an air carrier's business" merely because the flight was diverted from its course. The seizure of the aircraft by armed terrorists was an "accident" for purposes of liability under Article 17, and cannot be considered an "extraordinary circumstance" which would exclude coverage under the Convention.

 An examination of the proceedings of the Warsaw Convention (relevant extracts of the minutes have been provided by both sides) reveals that Article 34 was adopted to protect a carrier who, for a benevolent purpose, undertakes a flight which *from its inception* is to be performed under "extraordinary circumstances" and outside the normal scope of a carrier's business. The primary concern expressed by the delegates was that a carrier performing in an unusual situation would not be able to comply with such ticketing requirements as those required by Article 3. (This Article provides that a carrier who fails to deliver proper transportation documents to a passenger will not be entitled to any limit on his liability, though the presumption of liability would remain in force.)

The only example discussed as the type of transportation meant to be excluded by Article 34 was that of an emergency flight sent to rescue passengers stranded by disaster on a regularly scheduled run. It was felt to be unfair to impose a presumption of unlimited liability upon an airline in circumstances in which documentation requirements could not be met.

Article 34 was not intended to exclude from the Convention any regularly scheduled flight on which an abnormal event prevents completion; such a construction would render the Convention meaningless.

The motion of defendant Air France is granted and the Clerk is directed to enter judgment dismissing the first and second claims in the amended complaint for lack of jurisdiction over the subject matter. There is an express determination that there is no just reason for delay and an express direction for the entry of judgment. Fed.R. Civ.P. 54(b).

The motion of plaintiffs is denied as moot.

SO ORDERED.