John J. DeMARINES and Doris A. DeMarines, husband and wife

v.

KLM ROYAL DUTCH AIRLINES.

Civ. A. No. 74–653.

United States District Court, E. D. Pennsylvania.

June 28, 1977.

James E. Beasley, Beasley, Hewson, Casey, Kraft & Colleran, Philadelphia, Pa., for plaintiff.

Stephen J. Fearon, Condon & Forsyth, New York City, H. Wallace Roberts, Krusen, Evans & Byrne, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

Plaintiffs, John DeMarines and his wife, Doris DeMarines, sued defendant, KLM Royal Dutch Airlines, for injuries that he alleged were proximately caused by an accident that occurred aboard a DC-8 aircraft on May 20, 1972. The case, which was based on diversity jurisdiction, was tried before a jury from October 5, 1976 to October 18, 1976. The jury returned a verdict in favor of Mr. DeMarines in the amount of $1,000,000 and in favor of Mrs. DeMarines in the amount of $50,000.[1] Defendant has filed motions for a new trial and for judgment n.o.v. Oral argument was had on the motions. After carefully considering all of the grounds alleged by the defendant, this Court has determined that it must deny both motions.

Plaintiff and his wife were passengers aboard a KLM charter flight organized by the Pennsylvania Bar Association. Plaintiff claimed that an accident occurred in connection with the pressurization of the aircraft on May 20, 1972 on the portion of the flight between Zurich, Switzerland and Amsterdam, the Netherlands, and that this accident was the proximate cause of his permanent loss of equilibrium. The defendant contended at trial that an accident did

---

1. Mrs. DeMarines' sole claim was for loss of consortium.

not occur on the flight; that plaintiff did not suffer any permanent injury and that, if plaintiff was injured, the injury was not proximately caused by an accident occurring during the flight.

■ Motions for a new trial require the exercise of discretion by the Court whose ". . . duty is essentially to see that there is no miscarriage of justice." 6A *Moore's Federal Practice* ¶ 59.08[5] at 59–160; *Thomas v. E. J. Korvette, Inc.,* 476 F.2d 471, 475 (3d Cir. 1970). The jury's verdict may be vitiated only if manifest injustice will result if it were allowed to stand. The Court may not substitute its own judgment for that of the jury merely because it may have reached a different conclusion. To grant a motion for judgment n.o.v., the Court must find as a matter of law that the plaintiff failed to adduce sufficient facts to justify the verdict, *Neville Chem. Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1210 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Such a motion ". . . may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A *Moore's Federal Practice* ¶ 50.-07[2] at 2356.

I. *Sufficiency of the Evidence.*

A. Interrogatory No. 1—"Do you find that the plaintiff has proved by a preponderance of the evidence that there was an accident on board the aircraft on the portion of the KLM flight between Zurich and Amsterdam?"

■ The defendant claims that the verdict was contrary to the weight of the evidence. In summarizing the evidence and ruling on defendant's motions, we shall view the evidence and the inferences therefrom in a light most favorable to the plaintiff, the verdict winner. *Thomas v. E. J. Korvette, supra.*

Mr. DeMarines testified that he had no difficulty with pressure on the KLM flight from Philadelphia to Amsterdam on May 12, 1972 (N.T. 3–10). On the first leg of the return flight of May 20 (Zurich to Amsterdam), he suddenly felt an extreme, explosion-like pressure within his head (N.T. 3–11). He tried to form words, but could not speak, and he could hear nothing (N.T. 3–12). He described the sensation as a "stoned, completely numb feeling inside my head" (N.T. 3–14). At the same time, he saw two other passengers holding their ears in apparent pain and shaking their heads (N.T. 3–15). From Amsterdam to Philadelphia, the stoned, deep numbness feeling continued (N.T. 3–18), and that evening, on the way home, he experienced equilibrium loss—a "floating feeling"—which he testified continues to this day (N.T. 3–18–19).

Seven other passengers testified that they had experienced unusually severe problems with ear pain on this portion of the flight. Judge Louis Stefan, Common Pleas Court, Montgomery County, testified that he had severe pain in his ears during the entire flight, and that he noticed other passengers experiencing similar distress and complaining to the stewardesses (N.T. 2–3). Judge Stefan also testified that upon landing at Amsterdam he complained to the flight personnel who were in the cabin of the aircraft and told them that he had never felt anything like the ear problems which he had experienced on the flight and that the problem should be corrected before the next leg of the flight (N.T. 2–4, 2–20). Judge Stefan further testified that he had flown many times on pressurized aircraft (N.T. 2–16–17), and that the pain he experienced on the flight from Zurich to Amsterdam "was as severe as anything I have ever felt and beyond, much beyond, any pressure that I had ever experienced up to that time." (N.T. 2–5). He testified that his wife also complained to him that she was suffering severe earaches on the flight (N.T. 2–13–14). Other passengers gave similar testimony as to the pain they felt in their ears on this flight and of discussions among the passengers and reports to the flight crew concerning the problem.[2] Betty

---

2. The following passengers testified for plaintiff: George L. Herr (N.T. 1–47–69); Michael

Dowd (N.T. 1–70–1–80); William Schantz (N.T. 2–34–2–42); George Sacks (deposition) (N.T.

McWilliams, also a passenger, testified that she heard a flight steward tell a passenger to whom he was administering oxygen that "it was a wonder that other people hadn't complained because they were having a problem with the air pressure." (N.T. 1–85–86).

In defense, KLM called eight passengers on the flight.[3] They testified that they felt no pain or discomfort in their ears during the flight and that they did not hear any complaints by fellow passengers.[4] Defendant also called members of the flight crew who testified that there was no malfunction of the pressurization system and that nothing abnormal or unusual occurred on the flight in connection with the pressurization (N.T. 7–96, 8–22–26, 8–61, 8–122).

At trial, the parties agreed that the flight in question was an international flight with its destination in the United States, that plaintiffs were passengers on the flight, and that liability was governed by the terms of the Warsaw Convention,[5] as modified by the Montreal Agreement.[6] The Warsaw Convention is a treaty which applies to all international air transportation. *Block v. Compagnie Nationale Air France,* 386 F.2d 323 (5th Cir. 1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); *Husserl v. Swiss Air Transport, Ltd.,* 351 F.Supp. 702, 705 (S.D.N.Y.1972), *aff'd* 485 F.2d 1240 (2d Cir. 1973). The pertinent section which delineates a carrier's liability to a passenger is Article 17, which provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

As originally drafted, the Convention included the defenses of due care (Article 20(1)) and contributory negligence (Article 21) and set a limitation of liability to passengers of 125,000 francs, then the equivalent of $8,000 (Article 22(1)). Attempts to modify the low limit of liability led to a diplomatic conference at The Hague in 1955, at which time the Convention was amended to increase liability to the equivalent of $16,000. The United States, which was still dissatisfied with the low liability limitation, did not ratify The Hague Protocol. In November 1965, the United States exercised its power under Article 39 and denounced the Convention. On the eve of the effective date of the denunciation an interim agreement, known as the Montreal Agreement, was reached. This agreement provides for a limit of liability of $75,000, and also provides that the carrier shall not assert the defense of due care provided in Article 20(1).

The effect of Article 17 of the Convention as modified by the Montreal Agreement is to create liability regardless of fault or negligence on the part of the carri-

5–159); Henry Scheirer (deposition) (N.T. 5–156).

**3.** Both parties urge us to reject the testimony of the passengers for the opposing side. Defendant argues that the testimony of passengers called by the plaintiff should be rejected because each testified to experiencing pain during a different part of the flight. Plaintiff suggests that little weight should be given to the testimony of passengers called by the defendant because many of them testified to incorrect details concerning the flight. As stated before, it is not the function of this Court to assess credibility of the witnesses or to attempt to reconcile slightly differing recollections of a flight that occurred four years before the trial.

**4.** Passengers testifying for defendant were: Charles P. Larkin, Jr. (N.T. 6–14–24); Charles W. Frampton (N.T. 6–25–35); Elma B. Frampton (N.T. 6–35–47); Joseph Weintraub (N.T. 6–46–57); Oscar M. Hansen (N.T. 6–57–65); Seymour C. Wagner (N.T. 6–66–75); Austin O. Furst (N.T. 6–75–91); Margaret W. Furst (N.T. 6–91–6–99).

**5.** 49 Stat. 3000, *et seq.*

**6.** 31 Fed.Reg. 7302 (1966). Both the Convention and the Montreal Agreement are reprinted at 49 U.S.C. § 1502 note (1970).

er;[7] *McDonald v. Air Canada,* 439 F.2d 1402 (1st Cir. 1971); *Noel v. Linea Aeropostal Venezolana,* 247 F.2d 677 (2d Cir. 1957). Plaintiff must prove only the happening of an "accident" and damages proximately caused. *Husserl v. Swiss Air Transport Company, Ltd.,* 388 F.Supp. 1238, 1242, n. 4 (S.D.N.Y.1975). The term "accident" is not defined by the Warsaw Convention. Neither party has called to our attention any reported case in which a plaintiff has claimed that an "accident" aboard the aircraft caused him to suffer ear damage.[8] One of the few cases which has discussed the meaning of an "accident" under the terms of the Warsaw Convention is *McDonald v. Air Canada, supra.* In the *McDonald* case plaintiff fell while standing in the baggage claim area of the terminal after a transatlantic flight and the Court held that such facts did not establish the happening of an accident within the terms of the Warsaw Convention. The Court said:

> We see no basis for finding an accident, the first requirement for invocation of the Convention. Plaintiff did show that there were bags in her vicinity when she fell. However, even if the jury could have found that the bags were so close that when she fell she fell over one of them, it would be speculation to say that it was the bag which caused the fall. The area was well lighted. Plaintiff fell forward, and any bag in front of her must have been clearly evident. More important, she was not going anywhere, and there is no reason to think she was

proceeding across the floor. The burden was on plaintiff to prove there was an accident. On the facts established it seems as reasonable to suppose that some internal condition was the cause of the fall as that the fall was the result of an accident. *Id.* at 1404–05.

In this case, unlike the *McDonald* case, the plaintiff did produce evidence from which the jury could find that there was an accident aboard the aircraft.

■ In contexts other than the Warsaw Convention, "accident" has been defined as an unexpected and sudden event that takes place without foresight.[9] *Ketona-Chemical Corp. v. Globe Indem. Co.,* 404 F.2d 181, 185 (5th Cir. 1969); *Koehring Company v. American Automobile Insurance Co.,* 353 F.2d 993, 996 (1965); *Casper v. American Guarantee & Liability Ins. Co.,* 408 Pa. 426, 184 A.2d 247, 249 (1962). The Court charged the jury on the meaning of an accident as follows:

> An accident is an event, a physical circumstance, which unexpectedly takes place not according to the usual course of things. If the event on board an airplane is an ordinary, expected, and usual occurrence, then it cannot be termed an accident. To constitute an accident, the occurrence on board the aircraft must be unusual or unexpected, an unusual or unexpected happening.
>
> The event or occurrence is not an accident if it results solely from the state of health of the passenger and is unconnected with the flight. . . . The plain-

**7.** See Lowenfield and Mendelsohn, The United States and The Warsaw Convention, 80 Harv.L. Rev. 497 (1966–67) for a thorough discussion of the history of the treaty.

**8.** In *McCune v. Spantax, S.A. Transportes Aereos,* 66 F.R.D. 619 (S.D.N.Y.1975) and *Helfet v. Pan American World Airways, Inc.,* 12 CCH Aviation Rep. 17,247 (N.Y.Sup.Ct. Bronx County 1972) turbulence was the accident alleged by plaintiff. In *Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611 (S.D.N.Y.1955) plaintiffs' injuries resulted from a fall. In *Husserl v. Swiss Air Transport Company,* 351 F.Supp. 702 (S.D.N.Y.1972) the Court ruled that hijacking constituted an accident but did not deal with the definition of an accident per se. Other courts have agreed that hijacking is covered.

*Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152 (3d Cir. 1977); *Burnett v. Trans World Airlines, Inc.,* 368 F.Supp. 1152 (D.N.M.1973); *Rosman v. Trans World Airlines, Inc.,* 34 N.Y.2d 385, 358 N.Y.S.2d 97, 314 N.E.2d 848 (N.Y.Ct.App.1974); *Herman v. Trans World Airlines, Inc.,* 12 CCH Aviation Rep. 17,304 (N.Y.Sup.Ct. Kings County 1972).

**9.** Although interpretation of a treaty is not governed by local State law, *United States v. Belmont,* 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), both parties have cited State as well as Federal law in connection with the definition of an accident.

tiff does not have the burden of proving and does not have to prove what caused the accident or how it occurred or why it occurred.

Now in this case the explosion in his head which the plaintiff testified he experienced is what he claims to have been caused by an accident on the flight. The accident claimed by plaintiff is that something happened in connection with the pressure inside the cabin of that aircraft. (N.T. 10–17, 18).

Although defendant contends that the plaintiff produced no testimony that the pressure inside the aircraft was unusual or unexpected, the thrust of defendant's argument is that by failing to produce expert testimony concerning the pressurization on the aircraft the plaintiff failed to prove the occurrence of an accident. Expert testimony is warranted where facts are such that lay persons are likely to be unable to form a correct judgment without expert assistance. *United Telecomm., Inc. v. American Tel. & Comm. Corp.,* 536 F.2d 1310, 1317 (10th Cir. 1976); *Foster v. Borough of Glenolden,* 47 F.R.D. 276, 278 (F.D.Pa.1969), F.R. Evid. § 702. On the other hand, expert testimony is not necessary where the jury could pass judgment without assistance from persons possessing specialized knowledge on the subject. *Webb v. Fuller Brush Company,* 378 F.2d 500 (3d Cir. 1967). It is undisputed that plaintiff could have offered expert testimony to explain the pressurization on the aircraft. However, we do not believe that the failure to present such evidence was fatal to plaintiffs' case. The jury's task was to determine whether the plaintiff proved by a preponderance of the evidence that an accident—something abnormal or unexpected—occurred on board the aircraft. Plaintiff testified that he felt an explosion-like pressure in his head. He produced evidence that seven other passengers had experienced unusually severe problems with ear pain on the flight and that several of these passengers complained to the flight crew and remembered discussions among other passengers concerning ear pain. As heretofore pointed out, one of the passengers, Judge Stefan, testified that he had flown many times on pressurized aircraft but that the pain in the ear he experienced on this flight was much beyond any pressure that he had experienced up to that time. Mrs. McWilliams, another passenger who testified for the plaintiff, recalled that she had heard a flight steward tell a passenger to whom he was administering oxygen that "it was a wonder that other people hadn't complained because they were having a problem with the air pressure." There was no burden on plaintiff to prove the cause of the accident or any negligence on defendant's part. We therefore find that the evidence presented by the plaintiff was amply sufficient for the jury to answer the following question in the affirmative: "Do you find that the plaintiff has proved by a preponderance of the evidence that there was an accident on board the aircraft on May 20, 1972 on the portion of the KLM flight between Zurich and Amsterdam?"

B. Interrogatory No. 2—"Has the plaintiff proved by a preponderance of the evidence that he sustained injury proximately caused by the accident?"

Defendant contends that there was no competent testimony that plaintiff's injuries were proximately caused by an accident in connection with the pressurization of the aircraft. Dr. Bernard Ronis, an otolaryngologist (ear, nose and throat), testified that in his opinion the plaintiff was suffering from labyrinthosis, which is a dysfunction of the inner ear (N.T. 5–33). Various causes for plaintiff's equilibrium loss, such as a stroke (N.T. 2–74), a neurological disorder (N.T. 5–108–109, 111) and pre-existing medical conditions (N.T. 5–29, 5–31, 5–126) were ruled out by him and plaintiff's treating doctor, Dr. Miraldo. Dr. Ronis explained that he used the term "decompression" to mean the change which takes place in the cabin of an airplane while descending (N.T. 5–81).

Dr. Ronis was asked the following questions and gave the following answers:

Q Doctor, do you have an opinion based upon reasonable medical certainty, based upon the facts that I have just

given you in this court, reviewing the records of this man, including his Army records going back to 1940; further based on your examination and the history from Mr. DeMarines, whether the sudden decompression on May 20th while in flight is the cause of the problems that he experiences concerning equilibrium and vertigo?

A From the history that I elicited, I would state that the symptoms that he developed afterward, that have persisted since then, have been the result of this rapid decompression affecting his—

Q Exactly what is the condition that this gentleman suffers from and what can be done to correct it?

A He has a disorder termed labyrinthosis, which is a dysfunction or abnormal action of the inner structure of its connections.

The symptomatology lasting this length of time from May '72 to date strongly suggests that it is going to be permanent.

Q Do you have an opinion as to whether it is permanent?

A I strongly suspect that it is going to be permanent if it has lasted this length of time.

He also testified that because of the absence of prior equilibrium problems, "one can attribute his present clinical picture to what transpired when his symptoms first began" on May 20, 1972 (N.T. 5–37); that the inner ear dysfunction "took place as a result of rapid decompression" (N.T. 5–58); a decompression was "indicate[d] strongly" by the presence of his symptoms and those of others as well (N.T. 5–58); that "permanent and complete disability" from pressure changes is known and reported, and in this case "it has" been "produced by rapid decompression" (N.T. 5–124); that the "only diagnosis I can make is labyrinthosis" which "I must accept as being related to the epi-

sode that he described in the airplane in 1972" (N.T. 5–130); and that it was Dr. Ronis's "firm conviction" that the plaintiff's difficulties are and were related to the flight (N.T. 5–135).

Dr. Peter Miraldo, plaintiff's family physician, testified that on May 22, 1972 plaintiff called him and complained of a spinning feeling (N.T. 2–70). After seeing him, Dr. Miraldo made a provisional diagnosis of labyrinthitis, a condition of the inner ear (N.T. 2–71–72). He testified that he diagnosed the labyrinthitis as being related to the airplane trip (N.T. 2–81) and that he based this on the proximity of the flight and the symptoms (N.T. 2–81).

Defendant called two medical experts. Dr. Henry Shenkin, a neurological surgeon, testified that he examined the plaintiff and could find no neurological abnormalities (N.T. 7–151), that none of plaintiff's pre-existing conditions could have caused his present condition (N.T. 7–161), that plaintiff's symptomatology was not that of labyrinthitis (N.T. 7–168), and that plaintiff had no organic disability that would account for his symptoms (N.T. 7–157). Dr. Louis Welsh, a specialist in otolaryngology, testified that on the basis of his examination of the plaintiff there was no evidence of any organic disease of the inner ear (N.T. 7–17).

Defendant also argues that the above summarized medical evidence presented by the plaintiff was legally insufficient to establish a causal connection between the accident and plaintiff's injuries. The standard in the Federal courts and in the Pennsylvania courts is substantially similar. In *Neville Chemical Company v. Union Carbide Corporation*, 422 F.2d 1205, 1211–12 (3d Cir.), *cert. denied* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970), the Court stated the Federal rule as requiring the Court to determine "whether as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." [10]

---

10. Quoting *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969). In *Menarde v. Philadelphia Transp. Co.*, 376 Pa. 497, 103 A.2d 681 (1971), which is cited in *Denneny*, 407 F.2d at 440–41,

n. 14, the Pennsylvania standard is set forth as follows:

[The medical] expert has to testify, not that the condition of claimant might have, or even

Clearly Dr. Ronis's testimony, quoted earlier, was sufficient to meet this standard of medical causation. We find, therefore, that there was sufficient evidence for the jury to answer the following question in the affirmative: "Has the plaintiff proved by a preponderance of the evidence that he sustained injury proximately caused by the accident?"

C. Interrogatory No. 3—

"3(a) Have the plaintiffs proved by a preponderance of the evidence that damages should be awarded to John DeMarines and, if so, in what amount does the jury award damages to him?"

"3(b) Have the plaintiffs proved by a preponderance of the evidence that damages should be awarded to Doris DeMarines and, if so, in what amount does the jury award damages to her?"

Defendant contends that plaintiff's evidence was insufficient to establish that plaintiff would suffer future pain and suffering. As recognized in *Leizerowski v. Eastern Freightways, Inc.,* 514 F.2d 487, 491 (3d Cir. 1975), Pennsylvania courts have rejected the "reasonable certainty" standard and required instead:

. . . that there be sufficient evidence from which the jury may fairly derive the conclusion that the chances that the plaintiff will endure future pain and suffering preponderate over those that he will not. Such preponderance denotes probability or likelihood, and that is sufficient. (citations omitted).[11]

A related question is the amount of evidence needed to permit the jury to consider the permanent nature of plaintiff's injuries.[12] Permanent injuries must be based on something more than mere conjecture or speculation as to what might occur

in the future. *Messer v. Beighley,* 409 Pa. 551, 187 A.2d 168 (1963); *Honebein v. McDonald,* 299 F.2d 493 (8th Cir. 1962). The testimony of Dr. Ronis was sufficient evidence on which the jury could find that plaintiff would suffer future pain and suffering and permanent injuries.

The defendant contends that the jury's verdict of $1,000,000 damages to Mr. DeMarines and $50,000 for loss of consortium to Mrs. DeMarines was so grossly excessive that the Court should grant a new trial. Under both Pennsylvania law and the Federal law a jury's verdict is excessive only when it "shocks the conscience of the Court", *Gullborg v. Rizzo,* 331 F.2d 557, 561 (3d Cir. 1965); *Connolly v. Philadelphia Transportation Co.,* 420 Pa. 280, 216 A.2d 60, 64 (1966). *Cf. Frankel v. Heym,* 466 F.2d 1226 (3d Cir. 1972). In determining if a verdict is excessive every case must be evaluated according to its own facts, *Century "21" Shows v. Owens,* 400 F.2d 603, 611 (8th Cir. 1968); *Weaver v. Ford Motor Company,* 382 F.Supp. 1068, 1076 (E.D.Pa. 1974).

The plaintiff in this case produced evidence as to his loss of past earnings and impairment of future earning capacity. The plaintiff testified that his earnings as an attorney during the three year period before the flight of May 20, 1972 were as follows: 1969—$69,215; 1970—$59,236; 1971—$47,390. (N.T. 3–66–67). Plaintiff testified that in 1971 he was absent from work for three months because of an operation on his hand (N.T. 3–66). In his closing to the jury, plaintiff's counsel argued, without objection, that taking into account that plaintiff only worked three quarters of the year in 1971, the total figure for that year should be $63,187 (N.T. 9–171). Viewing the evidence, as we are required to do, in a

---

probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence. (citations omitted).

11. Quoting from *Wallace v. Pennsylvania Railroad Co.,* 222 Pa. 556, 71 A. 1086, 1088 (1909).

12. Defendant did not object to Dr. Ronis's testimony at trial, and made no objection when counsel for plaintiff argued to the jury at the close of the case that plaintiff would suffer future pain and suffering and permanent injuries.

light most favorable to the plaintiff, and deducting 40%, which was the amount stipulated by the parties as representing overhead for plaintiff's office expenses (N.T. 4–131–132), for this three year period plaintiff's net earnings per year averaged $38,328 or $3,194 per month. The plaintiff's gross earnings in the fifty-three month period following the May 20, 1972 accident until the lawsuit were as follows: 1972—$27,883; 1973—$22,014; 1974—$20,214; 1975—$14,050; 1976—$12,000. (N.T. 3–67–70). Adding these amounts and deducting the agreed 40% for overhead expenses, would have given the jury the amount of $57,697 [13] as total net earnings for this fifty-three month period or $1,088 per month. The loss per month is, therefore, $2,106. For the fifty-three month period this would amount to $111,618 [14] representing a loss of past earnings.

Plaintiff also testified that because of his injuries he was forced to decline an offer made in each of the years 1972 through 1975 to become the Solicitor of the South Whitehall Township School District, a position that paid between $12,000 and $15,000 per year (N.T. 3–34–35). The jury may well have considered this testimony and increased the plaintiff's past loss of earnings by $60,000 for a total figure of $171,618 for past loss of earnings.[15]

Another item of damages is compensation for the deprivation of pecuniary benefits reasonably expected to result from the plaintiff's future lost earning capacity. It is measured by the present cash value of the loss which the evidence shows will re-

sult from his injuries. *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 143 (3d Cir. 1973). Plaintiff's average net earnings per year prior to the accident were $38,328. Adding to this $15,000, the amount of the Solicitor to the School Board position, leaves $53,328 as plaintiff's average past yearly earnings. Both plaintiff and defendant in their memoranda appear to agree that the figure $6,000 represents plaintiff's average future earnings per year. Subtracting this amount from $53,328 (average past yearly earnings) would have given the jury a figure of $47,328 as his loss each year in the future. This amount must be reduced to present worth. The mortality tables introduced into evidence show the average life expectancy for a man plaintiff's age as 19.5 years (N.T. 6–3). It was stipulated that plaintiff intended to work as long as he was physically able (N.T. 6–2). Reducing to present worth the impairment of future earning capacity over twenty years leaves a net future loss of $609,215. The jury could, therefore, have found on the basis of the evidence presented that the plaintiff's future loss of earning power was $609,215. Adding to this the stipulated medical expenses of $2,727 and the past loss of income (previously calculated to be $171,618) would have given the jury a total of $783,560 without any amount for pain and suffering.[16] The remainder of the award of damages for past and future pain, suffering, mental anxiety and loss of well-being would on this basis approximate $216,440.

To assess the effect of the accident on the life of the plaintiff, it is necessary to exam-

---

13. Plaintiff in his post-trial memorandum calculates this amount at $48,847 by subtracting from the yearly earnings sums that plaintiff testified he earned in years prior to the accident. Plaintiff did not, however, add these amounts to the earnings in the years prior to the accident.

14. Plaintiff in his post-trial memorandum calculates the past loss of earnings at $103,669. Defendant in its post-trial memorandum calculates the loss of past earnings at $90,176. Defendant does not take into account that plaintiff's 1971 earnings represented a nine-month work period. Defendant has not included 1976 in the calculation.

15. Defendant has not included any sum for the position of Solicitor for the School Board in its calculation of $90,176 for past loss of earnings.

16. Plaintiff in his memorandum calculates $772,884 and defendant in its memorandum calculates $468,361. As heretofore pointed out, defendant did not take into account that plaintiff's 1971 earnings represented only three quarters of a year. Defendant did not include 1976 in this calculation and did not take into account the offer made to plaintiff to become Solicitor for the School Board.

ine plaintiff's activities before and after the accident. Plaintiff entered college at the age of 31 upon his discharge from the Army in 1946 (N.T. 3–26). After completing two years of college he entered law school and became a member of the Bar in 1952 (N.T. 3–26, 3–3). He began his own practice in 1959, took an associate in 1965, and formed a partnership in 1968 (N.T. 3–28). He worked six days a week and Sunday mornings (N.T. 3–23–24), averaging between 95 and 110 hours per week with his law practice and with a number of charitable organizations. Professional associates described him as "outgoing" (N.T. 2–40); "very aggressive, knowledgeable, intelligent" (N.T. 2–170); and a "very dynamic, outstanding individual" (N.T. 3–61). He enjoyed playing with his children, both at home and on vacations at the seashore (N.T. 3–83), and enjoyed working with his hands around the house (N.T. 3–72).

As a result of the accident, he testified that he loses concentration after a few hours of work (N.T. 3–87); that he has lost his memory (N.T. 3–85–86); and can't work more than 1 to 1½ hours a day (N.T. 3–32). He cannot drive (N.T. 3–31, 33) or play with his children (N.T. 3–83), and feels that his children are ashamed of him (N.T. 3–84). Office workers described him as drained of vitality, prone to loss of balance and unable to concentrate for an extended period (N.T. 3–44, 47–48; 5–141–143). Business associates testified that he suffered a diminishing reputation, had a reduced intellectual ability, and lost most of his clients (N.T. 5–149–154; 2–40–42; 2–172). His wife testified that he gets depressed easily, cannot attend church on a regular basis as he used to do (N.T. 5–177) and "just isn't the man he had been before." (N.T. 5–171).

From the record in this case, the jury could have found that plaintiff, who had been an exceptionally active person who worked 95 to 110 hours a week, has lost the ability to do the things that were important to him—engaging in the full-time practice of law, devoting himself to charity work, and being a good husband and father, and that he has suffered a diminished professional reputation among his colleagues and is aware that his mental capabilities are not respected today as they were prior to the accident. The defendant in its memorandum calculates that the jury awarded the plaintiff $531,638 for pain and suffering. In arriving at this figure, however, the defendant did not calculate past loss of earnings and future loss of earning capacity by considering the evidence presented the jury "in a light most favorable to the plaintiff" as it is required to do. Our calculations would approximate the award for pain and suffering to have been about $216,000, an amount which is clearly not excessive when considered with the evidence presented by the plaintiff as to his past and future pain and suffering.

Defendant also attacks the $50,-000 award to Mrs. DeMarines for loss of consortium.[17] Consortium has been defined as aid, society and conjugal fellowship. 18 P.L.E. Husband and Wife § 86, *Manning v. Mobile Aerial Towers, Inc.,* 359 F.Supp. 211, 213 (E.D.Tenn.1972), *aff'd in part and rev'd in part,* 488 F.2d 127 (6th Cir. 1973). There is no yardstick for determining the value of loss of consortium. *United States v. Varner,* 400 F.2d 369, 373 (5th Cir. 1968). Mrs. DeMarines testified that plaintiff gets depressed easily (N.T. 5–177); he tires very quickly (N.T. 5–172); that they cannot go out socially any more or go dancing as they did before the accident (N.T. 5–172); she must drive her husband because he is unable to drive a car (N.T. 5–172); he is no longer vibrant and energetic (N.T. 5–174); he can no longer work around the house, mow the lawn or work in the garden (N.T. 5–174–175). She testified that he "just isn't the man he had been before." (N.T. 5–171). We cannot find the $50,000 award to the plaintiff's wife "shocks the conscience" of this Court in view of the evidence presented to the jury.

---

**17.** Both husbands and wives can recover for loss of consortium in Pennsylvania. *Hopkins v. Blanco,* 457 Pa. 90, 320 A.3d 139 (1974).

## II. *Trial Errors Claimed By Defendant.*

### A. *Absence of Other Claims.*

 During the direct testimony of H.S. R.J. toe Laer, an employee of KLM's legal department, defendant made an offer of proof that Mr. toe Laer would testify that plaintiff was the only passenger on that flight to file a claim. Upon objection from plaintiff, defendant argued that this evidence was relevant to enable the jury to draw the inference that if there had been an accident aboard the aircraft, other passengers would have filed claims. Plaintiff's counsel then offered to stipulate that plaintiff was the only passenger on the flight who alleged serious injury, but defendant declined to enter such a stipulation (N.T. 7–6). The Court sustained the plaintiff's objection, ruling that whether or not passengers filed claims (as opposed to whether passengers complained) was not relevant as to whether or not there had been an accident aboard the aircraft. Generally one who does not sustain injuries does not file a claim. The fact that the plaintiff is the only one who filed a claim alleging that he was injured aboard the aircraft is not relevant as to whether an accident had taken place aboard the aircraft and such testimony may have opened the door to the plaintiff proving that he was the only one who actually received an injury as a result of the accident.

Defendant cites *Carpini v. Pittsburgh & Weirton Bus Co.*, 216 F.2d 404 (3d Cir. 1954) and *George v. Morgan Construction Co.*, 389 F.Supp. 253, 264 (E.D.Pa.1975) in support of its contention that the exclusion of such testimony was prejudicial error. However, both of these cases address the relevance of the absence of other accidents in the context of suits based on negligent design. In such cases the absence of prior accidents may be probative and thus relevant. In the instant case, plaintiff had the burden of proving the occurrence of an accident aboard the aircraft and the fact that others had not filed claims for damage is clearly not relevant on this issue. The Court finds no prejudice to the defendant in connection with this ruling.

### B. *Testimony of Dr. Welsh.*

 Dr. Welsh, a medical expert called by defendant, testified that he diagnosed plaintiff as showing no evidence of any organic disease of the inner ear (N.T. 9–17). Counsel for defendant then offered to prove that Dr. Welsh would testify that plaintiff's "present condition is caused by his pre-existing symptoms of cervical arthritis, diabetes and circulatory problems." (N.T. 9–25–26). Counsel for the plaintiff objected to this testimony on the grounds that the report by Dr. Welsh furnished to him prior to trial did not contain any such diagnosis.[18] The Court excluded the testimony, ruling

> I am not going to permit that testimony if there is not something in this report because, frankly, the very reason for handing over reports is so both sides will be aware of what's going on and not be sprung any surprises (N.T. 9–27).

The Court offered counsel for defendant a chance to point out whether the plaintiff had been made aware that his expert would so testify (N.T. 9–27).

 The Pre-Trial Order in this case, completed by both counsel and signed by the Court, provided:

> Part I(C) . . . No expert witness will be permitted to testify unless all opposing counsel, prior to the date of this Order, *have been informed in writing as*

18. Plaintiff at this juncture also pointed out that Dr. Shenkin, defendant's other medical expert, had just completed testifying that none of plaintiff's pre-existing conditions could have caused his present condition (N.T. 7–161), and that plaintiff had no organic disability that would account for his symptoms (N.T. 7–157). Plaintiff contended that such conflicting expert testimony should not be admitted for the additional reason that the jury should not be required to guess between contradictory evidence offered by the same party. *Commonwealth v. Gonzales*, 463 Pa. 597, 345 A.2d 691 (1975); *Menarde v. Philadelphia Transp. Co.*, 376 Pa. 497, 501, 103 A.2d 681, 684 (1954); *Mudano v. Philadelphia Transit Co.*, 289 Pa. 51, 60, 61, 137 A. 104, 107, 108 (1927).

*to the substance of said expert's testimony.* (emphasis added.) [19]

The purpose of this requirement in the pre-trial order is obvious, i. e., all parties shall be informed before trial as to the substance of the other party's expert testimony in order that he may be prepared to meet this testimony and will not be surprised by it. In this case it was assumed by the Court and the parties that Dr. Welsh's report, which had been made available to plaintiff prior to trial, contained the substance of the expert's testimony. The Court therefore finds there was no prejudicial error in excluding that portion of Dr. Welsh's testimony which was an opinion never previously expressed by him.

### C. Delivery of Ticket.

■ Defendant argues that it was prejudiced because the plaintiff raised the issue of failure to deliver a ticket on "the eve of trial." This is apparently correct. However, the trial to which defendant refers is the first trial of this case which took place in April 1976, and ended in a hung jury. The case was then retried in October 1976. The six-month period between the two trials can hardly be considered insufficient notice to defendant. Although in the pretrial order filed prior to the *first* trial defendant objected to plaintiff's delay in raising the issue as to the non-delivery of the ticket, defendant did not at any time make any such objection at the second trial.

## III. Charge to the Jury.

### A. Definition of Accident.

■ Defendant claims that the charge to the jury failed to explain that the "pressure explosion" which plaintiff testified occurred inside his head was not the "accident" for which defendant could be found liable. The Court's charge clearly distinguished the accident, i. e., the alleged pressurization problem, from the injury, i. e., the explosion in plaintiff's head.[20] The Court charged:

. . . . Mr. DeMarines claims that he sustained injuries on May 20, 1972 on the flight between Zurich . . . and Amsterdam. He contends . . . that he met with an accident on the flight *in connection with the pressurization* in the cabin of the aircraft . . . and that that accident was the proximate cause of his injuries.

KLM, however, takes the position that no such accident took place aboard this aircraft on that flight and *there was nothing unusual in connection with the pressurization* in the cabin . . . .. (N.T. 10–14).

. . . an accident is an event, a physical circumstance, which unexpectedly takes place not according to the usual course of things. If the event on board an airplane is an ordinary, expected, and usual occurrence, then it cannot be termed an accident. To constitute an accident, the occurrence on board the aircraft must be unusual or unexpected, an unusual or unexpected happening.

The event or occurrence *is not an accident if it results solely from the state of health* of the passenger and is unconnected with the flight.

. . . . . .

**19.** The information to be contained in a pre-trial order is within the discretion of the Court. *Ely v. Reading Co.,* 424 F.2d 758, 763 (3d Cir. 1970).

**20.** The defendant also contends that the Court, while ruling that defendant's point for charge No. 3 was adopted and incorporated, did not charge as requested and in effect denied point No. 3 without so advising defense counsel. This contention is without merit. The Court informed counsel that when a point for charge was "adopted and incorporated" the Court was in agreement with the general proposition and would cover in it the Court's own language.

(N.T. 9–110). Comparing the defendant's point No. 3 with the Court's charge shows that the Court did give the substance of the requested charge. A party has no vested interest in any particular form of instruction; the language of the charge is for the Court to determine. *Smith v. Pressed Steel Tank Co.,* 66 FRD 429, 433 (E.D.Pa.) aff'd 524 F.2d 1404 (3d Cir. 1975). If from the entire charge, read as a whole, it appears to the Court, as it does here, that the jury has been fairly and adequately instructed, then the requirements of the law are satisfied. *Shaw v. Lauritzen,* 428 F.2d 247 (3d Cir. 1970).

*Now in this case the explosion in his head which the plaintiff testified he experienced is what he claims to have been caused by an accident on the flight. The accident claimed by the plaintiff is that something happened in connection with the pressure inside the cabin of that aircraft.* (N.T. 10–17 to 10–18). (emphasis added).

It is our opinion that the above quoted portion of the charge clearly distinguished between the accident and the "explosion in the head" felt by the plaintiff.

> B. Interrogatory No. 4—"Do you find that the defendant has proved by a preponderance of the evidence that it delivered a passenger ticket to the plaintiff?"

 Article 3 of the Warsaw Convention requires the carrier to deliver a passenger ticket containing specified information, including the place and date of issue, the place of departure and destination, the name and address of the carrier and a statement that the transportation is subject to the liability provisions of the Convention. Article 3(2) provides:

> The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.

Article 22(1) of the Convention, as modified by the Montreal Agreement, limits the liability of the carrier to $75,000 for each passenger.

In its answer to plaintiff's complaint, defendant raised as an affirmative defense the terms and conditions of the Warsaw Convention which limited plaintiff's claim. The defendant argues that the Court erred in charging the jury that defendant had the

burden of proving delivery of a passenger ticket, contending that the burden is on the plaintiff to prove non-delivery.[21] We believe that this position is not supported by the provisions of the Warsaw Convention or by the case law.

Article 3, Section (2) by its very terms makes clear that it is the carrier who benefits from the limitation of liability, and that unless the carrier delivers a passenger ticket it cannot take advantage of these limitations. Requiring delivery of a ticket was enacted to provide passengers with a reasonable opportunity to take measures to protect themselves against the limitation of liability, such as taking out flight insurance, deciding not to take the flight, or entering into a special contract with the carrier. *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851 (2d Cir.), *cert. denied* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965). In *Mertens,* the Second Circuit held that presenting a ticket to a passenger after he had boarded the plane did not constitute "delivery" as a matter of law. A similar result was reached by the Ninth Circuit in *Warren v. Flying Tiger Line, Inc.,* 352 F.2d 494 (9th Cir. 1965), where the passenger was given a "boarding ticket" at the foot of the ramp leading to the aircraft. The Court held that the carrier could not avail itself of the Convention's limitation provision because the delivery was not performed so as to give the passenger an opportunity to take protective measures. The Court characterized delivery as "a right which was intended to be afforded [passengers] as a concomitant to the carrier's right to limit its liability." *Id.* at 498. In *Lisi v. Alitalia-Linee Aeree Italiane, Sp. A.,* 370 F.2d 508 (2d Cir. 1966), *aff'd* 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 (1968) (equally divided court), the carrier pleaded the limitation provision of the Convention as an affirmative defense, and the District Court granted plaintiff's motion to dismiss this defense on the ground that the carrier had failed to effectuate a "delivery" of the ticket and properly notify the passengers of the applicability

---

**21.** The jury was not charged that the Warsaw Convention contains a limitation of liability and

was not told the legal effect of Interrogatory No. 4.

of the Convention. The Second Circuit affirmed, holding that the ticket in question did not give adequate notice because the provisions relating to the Convention were so artfully "camouflaged in Lilliputian print" as to be concealed. 370 F.2d at 514.

Cases considering the delivery of a ticket issue have viewed it as an affirmative defense of the carrier. *E.g., Block v. Compagnie Nationale Air France,* 386 F.2d 323, 325 (5th Cir. 1967), *cert. denied* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); *Lisi v. Alitalia-Linee Aeree Italiane,* 253 F.Supp. 237, 238, 243 (S.D.N.Y.); *Glenn v. Compania Cubano de Aviacion S.A.,* 102 F.Supp. 631 (S.D.Fla.1952). In the instant case, defendant raised the limitation issue as an affirmative defense. As stated in *McCormick, Law of Evidence,* § 318 at 673–74 (1954):

> In civil cases, almost the only useful general rule which will aid you in ascertaining who has the burden of persuasion of a particular fact or group of facts is this, that if the fact is one that is required to be "affirmatively" pleaded by the defendant, he will ordinarily have the burden of persuasion in establishing it, otherwise such burden will be cast upon the plaintiff. (footnotes omitted).

In *Ross v. Pan American Airways,* 299 N.Y. 88, 85 N.E.2d 880, 885 (1949), *cert. denied* 349 U.S. 947, 75 S.Ct. 874, 99 L.Ed. 1273 (1955), the court held that "there is no need for a carrier who claims the limitation to show more than the delivery of an appropriate ticket." Rejecting plaintiff's contention that delivery of the ticket to the person who arranged plaintiff's travel was insufficient, the Court ruled that the aims of the Convention would be poorly served "by any holding that the limitation of liability is available only *when a carrier can produce affirmative proof* not only that the passenger ticket complied with the Convention, but that the individual who bought that

ticket at the carrier's ticket counter was the passenger himself . . . .." 85 N.E.2d at 885–86 (emphasis added). The implied recognition in all of the cases is that it is the carrier's burden to establish sufficient delivery to enable it to limit recoverable damages.

The only case holding to the contrary is *Mertens v. Flying Tiger Line, Inc.,* 8 Av. Cas. 18,023 (S.D.N.Y.1963) *reversed on other grounds* 341 F.2d 851 (2d Cir. 1965). There the Court relied on the decision in *Grey v. American Airlines,* 227 F.2d 282 (2d Cir. 1955), *cert. denied* 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956), which discusses the burden of proof in connection with Article 25 of the Warsaw Convention. Article 25 sets forth another instance when the carrier is precluded from claiming the limits of liability set forth in the Convention. Article 25 provides:

> (1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct . . . ..

In determining the proper burden of proof pursuant to Article 25, the Court in *Grey* held that the defendant did not have the onus of proving a negative, i. e., that the damage was not caused by its wilful misconduct, and therefore placed the burden of proving wilful misconduct on the plaintiff. The Court held the policy of the Warsaw Convention to be the protection of air carriers from the burden of excessive claims in cases where destruction of the aircraft and death of the passengers make it virtually impossible to determine the cause of the accident. The Court in *Grey* reasoned that in such circumstances the Convention was designed to relieve the carrier of the burden of proving lack of wilful misconduct, while at the same time giving an injured passenger the opportunity to prove wilful misconduct.[22] Because the Court in *Grey* required

---

**22.** At the time of the *Grey* decision the Warsaw Convention contained a defense that has since been deleted. Pursuant to Section 20(1), which was eliminated by the Montreal Agreement, the carrier could avoid liability if "the carrier

proved" that it had taken all necessary measures to avoid the damage. In holding that plaintiff had the burden of proving wilful misconduct, the Court noted that unlike Article 20(1), Article 25 did not specifically provide

the plaintiff to prove wilful misconduct, the District Court in *Mertens* held "there appears to be no valid reason" why plaintiff should not also prove non-delivery of a ticket.

We believe that the different purposes for which these two provisions were enacted and the way in which they operate support a different allocation of the burden of proof. The Court in *Grey* recognized that in the event of a crash where the plane is destroyed and the passengers and crew killed, requiring a carrier to prove that the crash had not been caused by its wilful misconduct would be an undue burden. On the other hand, this same consideration leads to the contrary conclusion with respect to delivery of a ticket, for in the case of a crash the carrier would undoubtedly be in a better position than the passenger to check its records and prove that a ticket had been delivered. Unlike proving wilful misconduct, there is no policy reason which should relieve a carrier from proving the existence of a ticket, and no case (other than the District Court opinion in *Mertens*) has so held. The Court properly placed the burden of proving the delivery of a ticket on the defendant.[23]

█ Furthermore, assuming that the burden of proving nondelivery was on the plaintiff, the evidence produced at trial was insufficient to have enabled the jury to have found that a ticket had been delivered. All of the passengers called by both parties testified either that they never received a ticket or could not remember receiving one. Plaintiff testified that a month before the flight he received from the Marriott World Travel, the charter agent, a trip Pak containing a boarding pass and other information stating that the charter agent would be at the airport to assist with check-in and to

distribute tickets (N.T. 3–5; 4–31, 36–37). At the airport plaintiff received a tag for his luggage (N.T. 3–9). There was no Marriott agent to assist him (N.T. 4–34). Plaintiff further testified that he was never given a ticket (N.T. 3–9) and that he entered the plane by showing his boarding pass (N.T. 4–38).

Rocco Papulardo, a charter sales agent for KLM, testified that, according to KLM records, tickets were ordered by KLM on May 9, 1972 (N.T. 9–56), and according to customary practice should have been made up in New York City and sent by messenger to Kennedy Airport in New York (N.T. 9–55–56). According to "ordinary practice", these tickets, together with the boarding passes prepared at the same time, should have left Kennedy Airport with a KLM representative when the plane flew to Pittsburgh (the first departure site for the tour on May 12, 1972) (N.T. 9–63–64). The KLM representative with the tickets and boarding passes should have flown on the plane from Pittsburgh to Philadelphia, and upon the plane's arrival in Philadelphia, the tickets and boarding passes for Philadelphia passengers should have been handed out when they checked in (N.T. 9–79–80). However, no evidence was presented that any tickets were delivered to or received from the passengers who boarded the flight in question.

In opposing plaintiff's motion for a directed verdict in connection with the issue concerning the delivery of the ticket, the defendant conceded that the evidence of customary practice alone was insufficient to prove delivery (N.T. 9–89). Defendant argued that the witness's testimony that there was nothing in the records to show a deviation from standard practice (N.T. 9–

that it is the carrier who must prove this element.

**23.** Defendant has cited the comments of Mr. Drion, a delegate for the Netherlands to the International Conference on Private Air Law held at The Hague in 1955 who said that the burden of proving non-delivery should be on the passenger. ICAO Doc. 7686–LC 140 Vol. I, at 130. While the intent of the drafters should

be considered, we do not believe Mr. Drion's comment to be determinative of this issue. *See e. g.,* the comments of Mr. Jara, a delegate from Spain, at 129. *But see* the comments of Mr. Ambrosini, a delegate from Italy, at 139. We note further that the Amendment to the Convention known as The Hague Protocol, although adopted by a number of countries, has not been ratified by the United States.

66) was sufficient evidence to warrant charging the jury on the issue of the delivery of the ticket (N.T. 9–89). However, the evidence is uncontradicted that there was a significant deviation from standard practice. KLM's standard practice was for its representative to distribute boarding passes immediately prior to the flight. The plaintiff and other passengers testified that boarding passes were mailed at least a month in advance of the flight by Marriott and were not delivered by KLM representatives. Therefore even if we should assume that the burden of proving non-delivery was on the plaintiff, on the basis of the evidence presented in this case the jury could not reasonably have found anything other than "non-delivery."

### C. *Charge on Damages.*

Defendant contends that the use of the phrase "the accident" while charging on damages conveyed to the jury the impression that in the Court's opinion an accident had occurred. Construing the charge as a whole, *United States v. Heavlow,* 468 F.2d 842, 844 (3d Cir. 1972) *cert. denied* 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973); *Fredonia Broadcasting Corp., Inc. v. RCA Corporation,* 481 F.2d 781, 797 (5th Cir. 1973), the jury could not have possibly been confused as to the Court's meaning. The Court submitted interrogatories to the jury, which were explained during the Court's charge. The first interrogatory required the jury to determine if the plaintiff had proved by a preponderance of the evidence that there was an accident on the flight. After the Court charged on the meaning of an accident, the jury was instructed that if the answer to interrogatory No. 1 was "No", i. e., the plaintiff did not prove the occurrence of an accident, they should stop and go no further in their deliberations. Only if they answered "Yes" could they go on to the second interrogatory which was:

> Has the plaintiff proved by a preponderance of the evidence that he sustained an injury proximately caused by the accident?[24]

Following a definition of causation, the jury was again instructed to go to the next interrogatory, dealing with damages, only if interrogatory No. 2 had been answered in the affirmative. The jury was instructed eight more times that it could award damages only if it found that the plaintiff had proved liability by a preponderance of the evidence. The jury could not have possibly been misled into believing that the Court was expressing its opinion as to the merits of plaintiff's liability claim.

While we have not discussed every contention that was briefed, we have, however, reviewed the record and considered all of the grounds alleged by the defendant in its motions for a new trial and judgment n.o.v. and we hold that none of them either singly or collectively has sufficient substance to merit any further discussion as a basis for granting a new trial or judgment n.o.v. in this case.

For all of the aforementioned reasons, we deny defendant's motions.

---

24. The defendant did not object to the wording of this interrogatory. (N.T. 9–134–135).